# Illinois Official Reports

## Appellate Court

---

### *People v. Carter*, 2016 IL App (3d) 140196

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CORNELIUS D. CARTER, Defendant-Appellant. |
| District & No. | Third District<br>Docket No. 3-14-0196 |
| Filed<br>Modified upon<br>denial of rehearing | July 25, 2016<br><br>September 2, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Rock Island County, No. 10-CF-821; the Hon. Walter D. Braud, Judge, presiding. |
| Judgment | Affirmed in part, vacated in part, and remanded with directions. |
| Counsel on Appeal | Michael J. Pelletier and Sean Conley, both of State Appellate Defender's Office, of Ottawa, for appellant.<br><br>John L. McGehee, State's Attorney, of Rock Island (Robert M. Hansen, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE CARTER delivered the judgment of the court, with opinion.<br>Justice McDade specially concurred, with opinion.<br>Justice Wright dissented, with opinion. |

**OPINION**

¶ 1    Defendant, Cornelius D. Carter, argues on appeal that his conviction for aggravated battery with a firearm should be reversed because the trial court abused its discretion in allowing the State to present an excessive amount of other-crimes evidence related to an alleged escape attempt from the county jail. We affirm in part, vacate the DNA analysis fee and the fines improperly imposed by the circuit clerk, and remand for the trial court to modify its judgment on fine, fees, and costs in accordance with this order.

¶ 2                                              FACTS

¶ 3    Defendant was charged with aggravated battery with a firearm (720 ILCS 5/12-4.2(a)(1) (West 2010)). In October 2012, while incarcerated in the Federal Bureau of Prisons, defendant requested a disposition of all pending Illinois charges through the interstate Agreement on Detainers statute (730 ILCS 5/3-8-9 (West 2012)). The detainer documents listed another pending Illinois case in addition to the instant case.

¶ 4    The State filed a motion *in limine* requesting that the court deem evidence of defendant's alleged escape attempt from the county jail in July 2013 to be admissible at defendant's aggravated battery trial. Said evidence would include defendant's audiotaped phone calls from jail, physical evidence, testimony, and photographs. Defendant objected. Following a hearing on the State's motion, the trial court ruled that evidence of defendant's escape attempt was admissible. The court advised the State that it wanted "as little [evidence] as possible" regarding the escape attempt. The court added, "I want the case to be about the shooting, not about the escape."

¶ 5    A jury trial was held. Kameron Angel testified that he had known defendant since he was 10 or 11 years old and they had been close friends. On the evening of August 30, 2010, Kameron was socializing with his brother, Granvil Angel, defendant, and several other people. Defendant was wearing a black hooded sweatshirt, dark colored pants, and hospital gloves. Defendant had been wearing the hospital gloves all day, and Kameron did not think it was strange. Defendant showed Kameron a handgun that he had in the pocket of his hooded sweatshirt. Kameron asked if he could purchase the gun, and defendant said Kameron could purchase it after defendant was done with it. A few minutes later, defendant asked Kameron to go somewhere with him.

¶ 6    Kameron walked with defendant to a garage near a store called Jesse Mart. They entered the garage, and defendant told Kameron there was a gun under a dresser. The garage was dark so Kameron used his cell phone as a light. Kameron bent down to look for the gun, and defendant shot him in the back of his neck and his back. Kameron fell to the ground. Defendant took Kameron's cell phone and called or texted someone with it. Defendant then shot Kameron three more times in the back and arm. Kameron lay down and did not move.

¶ 7    Defendant left the garage. After a minute or two, Kameron got up and jogged to Jesse Mart. The clerk at Jesse Mart called 911, and several police officers and an ambulance arrived. Kameron told the officers that defendant shot him. Kameron was taken to the hospital to be treated. While at the hospital, Kameron picked defendant out of a photographic lineup as the individual who shot him. Kameron was in the hospital for several days and continued to have back problems because a bullet was still in his spine.

¶ 8    Kameron did not have his cell phone after the shooting. Kameron did not send a text message to Granvil on the night of the shooting saying that he was going to Kia's house. Kia was the mother of Kameron's son.

¶ 9    Kameron spoke to Tresvour Robertson in jail approximately a year prior to trial, and Robertson told Kameron that defendant was paid to kill Kameron. Kameron and Granvil had obtained a pound of cannabis from Marcus Hampton and Robertson's cousin, T.J. Everett, prior to the shooting and decided not to pay for the cannabis.

¶ 10    Kameron acknowledged that he had previously pled guilty to the offense of "going armed with intent" for throwing a golf club at someone, for which he was on probation.

¶ 11    Granvil testified that he was Kameron's brother. At approximately 9:30 p.m. on the evening Kameron was shot, Granvil, Kameron, defendant, and several others were smoking cannabis together. Defendant asked Granvil to go somewhere with him. Granvil told defendant he did not feel like walking anywhere. Defendant asked Granvil a second time, and Granvil again refused. Defendant then asked Kameron, and Kameron agreed. Defendant and Kameron began walking toward Jesse Mart. Defendant was wearing black clothing and latex gloves.

¶ 12    At approximately 10:15 p.m., the police came to the house where Granvil and his friends were smoking. The police banged on the door and said someone had been shot. Granvil left and started walking because he had a "really bad feeling in the gut of [his] stomach." While he was walking, Granvil received a text message from his father stating that Kameron had been shot. Around that time, Granvil also received a "weird text message" from Kameron's cell phone which said that Kameron was with Kia. Granvil could not remember if he received the text message from Kameron's phone before or after the text message from his father. Granvil later talked to Kia and learned that she had not spoken with or seen Kameron that night. Kameron later told Granvil that he did not send that text message.

¶ 13    After he received the text message from his father, Granvil saw a car driving down an alley and motioned for the car to stop. Granvil recognized the driver as Arletha Farmer and asked for a ride to the hospital. Granvil then noticed that defendant was in the backseat. Farmer agreed to give Granvil a ride, and Granvil got in the backseat with defendant. Granvil repeatedly asked defendant what happened to Kameron. Defendant said, "I don't know, I just ran." Defendant was sweating profusely and smoking cigarettes. Defendant twice asked Farmer to pull over so he could get out, but she did not pull over. Defendant was wearing different clothes than he had worn earlier in the evening. Specifically, defendant was wearing blue jeans and a white muscle shirt. When the car arrived at the hospital and Granvil got out, the car sped off.

¶ 14    Granvil testified that approximately one week before the shooting, Granvil and Kameron obtained one pound of cannabis, which was worth approximately $1000, from Everett, Robertson, and Hampton. Kameron and Granvil later discovered that the cannabis was bad and refused to pay for it. Everett, Hampton, and Robertson called Granvil a few days later after he refused to pay for the cannabis and told Granvil that they were going to kill him and Kameron. They said that the "hit [was] going to be so close that [he was] not going to see it coming."

¶ 15    Farmer testified that she had known defendant for about five years. On the evening of the shooting, Farmer was driving around with a friend. At approximately 10:30 or 11 p.m., Farmer saw defendant walking down the street and gave him a ride. A few minutes later,

Farmer saw Granvil. Farmer did not know Granvil, but she knew of him. Granvil asked for a ride to the hospital, and Farmer drove him to the hospital. Farmer heard defendant and Granvil greet each other when Granvil got into the car, but they did not talk much during the ride. Farmer dropped Granvil off at the hospital and drove away. Farmer did not recall telling a police officer that defendant told her someone had been shot when she picked him up.

¶ 16    Police Officer Greg Whitcomb testified that when he interviewed Farmer the day after the shooting, Farmer said that when she picked defendant up, he told her there had been a shooting.

¶ 17    Police officers who investigated the shooting testified that when they responded to the 911 call, Kameron told them defendant shot him in an abandoned garage. The officers observed bullet wounds on Kameron's neck and left arm. An officer later located the garage and found a pool of blood and what appeared to be bullets. Whitcomb testified that he showed Kameron a photographic lineup, and Kameron identified defendant as his shooter.

¶ 18    Robertson testified that he knew Everett and Hampton. Kameron and Granvil obtained approximately one pound of cannabis from Everett, who had received the cannabis from Robertson. Kameron and Granvil did not pay for the cannabis. Prior to the shooting, Robertson saw Everett speaking with defendant in a car parked in Robertson's backyard. After Everett spoke to defendant, Everett told Robertson that defendant was going to "get Kameron." After the shooting, defendant asked Robertson to tell Everett to pay defendant. Robertson stated that he did not hire defendant to kill Kameron. Robertson believed the marijuana Kameron and Granvil took was worth approximately $800 and was not worth killing someone over. Robertson was currently incarcerated for the offense of intimidation with a dangerous weapon, which was unrelated to the instant case. The State agreed not to prosecute Robertson for hiring defendant to shoot Kameron if Robertson testified against defendant.

¶ 19    The remaining evidence, which concerned defendant's attempted escape from the county jail, was admitted over defendant's objection. Edward Schliltz, a correctional officer, testified that while working at the county jail on July 23, 2013, he smelled smoke near the inmates' cells. Schliltz and other officers thoroughly searched the inmates, the cells, and the day rooms. One officer found a hacksaw handle, cell phone, cell phone charger, and a mop handle with several pieces of a torn T-shirt wrapped around it in a garbage can in one of the day rooms. Defendant had the same T-shirt material that was found in the garbage can wrapped around his hand. The officers also found a hollowed-out Bible containing a socket cover in one of the common areas. In defendant's cell, the officers discovered a four-inch square hole in the window, which was covered with a piece of plastic. The window's steel frame and beam had been cut through with a hacksaw. No other inmate shared a cell with defendant. Schliltz believed that the officers found a piece of paper in defendant's cell that contained several phone numbers that were found in the cell phone retrieved from the day room. A different inmate claimed that the cell phone the officers found belonged to him.

¶ 20    Jason Patterson, a sheriff's department employee, testified that he investigated a hole in the window of defendant's cell on July 23, 2013. Defendant had occupied the cell since December 28, 2012. No one else occupied the cell at the time the hole was found. Sixteen photographs were admitted into evidence. Patterson identified and described the photographs, which depicted defendant's cell, including the hole in the window and the cut marks on the window's metal bar, the day room at the county jail, and items of contraband found by the

officers. Patterson found hacksaw blades in defendant's toilet and strips of fabric in defendant's cell. The contraband items found in the common areas included a cell phone and charger, a hollowed-out book containing a socket plate with burnt edges, strips of a T-shirt that were tied together, and fabricated paper rods. Some of the pictures showed defendant's cell window from outside the building. Electrical tape and a light socket were found on the roof underneath defendant's cell window.

¶ 21    The parties stipulated that a sheriff's department employee would testify that he provided investigator Mindy Meyers with a compact disc (CD) that included recordings of 14 telephone and visitation conversations of defendant between June 1 and July 27, 2013. The CD was admitted into evidence but not played for the jury. Whitcomb was recalled as a witness and testified that he listened to all the recorded conversations contained on the CD. Whitcomb was familiar with defendant's voice and reported that all the recordings contained defendant's voice except two or three conversations.

¶ 22    Mindy Meyers, an investigator employed by the sheriff's department, testified that she was assigned to listen to defendant's recorded telephone and visitation conversations. Meyers briefly described 12 recorded conversations of defendant, which were contained on the CD previously offered into evidence but not played for the jury. In one conversation with an unknown man, defendant asked the man to give someone named DeShawn "a little bit of bread" because DeShawn was "getting things" for defendant. Most of the other conversations that Meyers described involved defendant asking various people to obtain a cell phone for him, buy minutes for his cell phone, call him, or bring him things.

¶ 23    The State also introduced a different CD containing a recording of a visitation conversation between defendant and Shakera Abbey. Meyers testified that, based on her investigation, she believed Abbey was defendant's girlfriend. The CD was played for the jury, and a transcript of the conversation was introduced into evidence.

¶ 24    During defendant's conversation with Abbey, defendant told Abbey he would probably not be there next month. Abbey responded, "You trying to pull it off this month?" Defendant replied, "I just… there's a chance that I might not be here next month." Abbey told defendant not to do anything he would regret. Defendant replied that he was going to trial. He then stated, "See, hopefully I won't make it to trial *** so I'm hoping, but I'm supposed to go to trial, you know, if I loose [*sic*] my trial…shhhh…man, I'm trying to breaking [*sic*] me out or something. *** I am gonna win in my own way man. Somehow someway [*sic*] man." Defendant told Abbey that she would see him soon under "certain circumstances." Abbey told defendant to call her. Defendant replied, "I'm for real man." Abbey responded, "I know, you probably tired of being in here." Defendant then said, "We're going off in the sunset together."

¶ 25    Defendant asked Abbey to get a pen and directed her to draw a picture. Defendant asked Abbey if she remembered what he told someone named "Deshar" to get for him, and Abbey replied that she remembered. Defendant told Abbey to call Deshar and ask if he was going to get it. Defendant asked Abbey to get it for him herself if she could not reach Deshar. Defendant said that he needed it before Wednesday. Defendant said that Abbey would be able to get the items at Walmart, Menards, K&K, True Value, or any hardware store. Defendant told Abbey that she had to be careful because the items would be sharp. Defendant then added: "[Y]ou just got to make sure, hell, that no matter what kind you get that you got the kind that go through handcuffs alright?"

¶ 26 Meyers testified that she also took pictures of the outside of the jail in connection with the investigation into the contraband found in defendant's cell. She took a photograph of black electrical tape, which was found on the ground outside the jail. The photograph had previously been introduced into evidence during Patterson's testimony. Finally, Meyers testified that when the inmates were in their jail cells, no one was able to come in or out of the cell without a correctional officer opening the door. The inmates leave their cells during the day and stay in the day room. The cell doors are locked, and no inmates are able to access their own cells or other inmates' cells during that time.

¶ 27 The State rested. Defendant did not present any evidence. During its initial closing argument, the State did not mention the escape evidence. Defense counsel argued that defendant was only using the hole in his jail cell window to smuggle in cigarettes and a cell phone and was not attempting to escape. During its rebuttal argument, the State contended that defendant was using the hacksaws to cut through his window in an attempt to escape.

¶ 28 During deliberations, the jury requested a copy of the transcript of defendant's conversation with Abbey. The jury found defendant guilty. On January 17, 2014, the trial court sentenced defendant to 30 years' imprisonment to be served consecutively with his sentence in his federal case. On January 24, 2014, the trial court entered a written judgment order, which required defendant to pay "the costs of prosecution." The written order provided that these costs were reduced to judgment against defendant. On January 27, 2014, the circuit clerk entered a judgment against defendant in favor of the State in the amount of $597.

¶ 29 A cost sheet titled "Payment Status Information" and dated April 22, 2014, appears in the record. The following assessments along with the following descriptions appear on the cost sheet: (1) $100 "Clerk," (2) $50 "State's Atty," (3) $50 "Court," (4) $15 "Automation," (5) $25 "Violent Crime," (6) $25 "Judicial Security," (7) $15 "Document Storage," (8) $10 "Medical Costs," (9) $250 "DNA Identification," (10) $5 "Youth Diversion," (11) $0.25 "Clerk Op Deduction," (12) $4.75 "Drug Court," (13) $10 "Clerk Op Add-Ons," (14) $10 "State Police Svcs," (15) $15 "State Police Ops," (16) $2 "SA Automation Fee," and (17) $10 "Probation Ops Fee."

¶ 30                                               ANALYSIS
¶ 31                          I. Other-Crimes Evidence of Attempted Escape
¶ 32 Defendant argues that the trial court erred in allowing an excessive amount of other-crimes evidence regarding defendant's attempted escape from the county jail such that the trial court conducted a trial within a trial on defendant's escape attempt.

¶ 33 It is a longstanding proposition of Illinois law that evidence of the crime of attempted escape and the related crime of flight is admissible for the purpose of showing a defendant's consciousness of guilt. *Jamison v. People*, 145 Ill. 357, 376 (1893) (attempted escape); *People v. Duncan*, 261 Ill. 339, 352-53 (1913) (suicide attempt as attempted escape); *People v. Bundy*, 295 Ill. 322, 329-30 (1920) (flight); *People v. Limeberry*, 298 Ill. 355, 370 (1921) (attempted flight); *People v. Spaulding*, 309 Ill. 292, 306 (1923); *People v. Talbe*, 321 Ill. 80, 91 (1926) (attempted escape); *People v. Rappaport*, 362 Ill. 462, 468 (1936) (flight); *People v. Gambino*, 12 Ill. 2d 29, 32 (1957) (escape and attempted escape); *People v. Harper*, 36 Ill. 2d 398, 403-04 (1967) (attempted escape); *People v. Yonder*, 44 Ill. 2d 376, 392 (1969) (two hacksaw blades hidden in the defendant's shoe were evidence of attempted escape); *People v. Gaines*, 88 Ill. 2d 342, 366 (1981) (escape); *People v. Gacho*, 122 Ill. 2d 221, 246 (1988)

(letter indicating that defendant wanted to escape admissible as evidence of consciousness of guilt).

¶ 34    Other-crimes evidence is admissible only if the probative value of the evidence is not outweighed by its prejudicial effect. *People v. Adkins*, 239 Ill. 2d 1, 23 (2010); Ill. R. Evid. 403 (eff. Jan. 1, 2011) ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."). A trial court's decision to admit other-crimes evidence will not be overturned absent a clear abuse of discretion. *Adkins*, 239 Ill. 2d at 23. Even if relevant, other-crimes evidence should not become a focal point of the trial. *People v. Boyd*, 366 Ill. App. 3d 84, 94 (2006). "Courts have warned against the dangers of putting on a 'trial within a trial,' with detail and repetition greatly exceeding what is necessary to establish the particular purpose for the evidence." *Id.* (quoting *People v. Bartall*, 98 Ill. 2d 294, 315 (1983)).

¶ 35    We find that the trial court did not abuse its discretion in allowing the State's evidence regarding defendant's escape attempt. First, the escape evidence had high probative value in that it showed defendant's consciousness of guilt. We find the evidence offered by the State was reasonably necessary to show defendant's escape attempt. Defendant's recorded conversation with Abbey was needed to show that defendant intended to escape from jail. During the conversation, defendant told Abbey, "I'm trying to breaking [*sic*] me out or something." He also directed Abbey to obtain an item from a hardware store for him that could cut through handcuffs. Defendant's conversation with Abbey showed that the items of contraband that were subsequently connected to him were related to an escape attempt rather than a smuggling operation, as defense counsel argued at trial.

¶ 36    Evidence of the discovery of hacksaw blades in defendant's toilet and other items of contraband linked to defendant showed that the escape plan defendant discussed with Abbey went beyond mere fantasy and that defendant was actually in the process of executing the plan. The additional recordings of defendant's telephone and visitation conversations in which he sought cell phones and other items helped link him to the items of contraband that were ultimately found.

¶ 37    We reject defendant's contention that the probative value of the attempted escape evidence in the instant case was low because it is unlikely that defendant would have been able to cut a sufficiently large hole in his window to actually escape. We note Illinois courts have admitted evidence of possession for the means of escape or the intent to escape to show consciousness of guilt even when no actual escape was attempted. See *Yonder*, 44 Ill. 2d at 392 (hacksaw blades hidden in the defendant's shoe); *Gacho*, 122 Ill. 2d at 245-46 (letter defendant sent from jail stating that he believed he could escape).

¶ 38    Similarly, we find no merit to defendant's contention that the probative value of the escape evidence was somehow lessened due to the fact that he was serving a federal sentence and was facing charges in another Illinois case. Evidence of attempted escape is admissible even when a defendant is incarcerated on multiple charges. See *In re L.F.*, 119 Ill. App. 3d 406, 409 (1983); *People v. Day*, 76 Ill. App. 3d 571, 585 (1979). As defendant presented no evidence either at the hearing on the State's motion *in limine* or at trial that his escape attempt was related to anything other than the instant case, for which he was awaiting trial at the time of the escape attempt, we decline to find that the probative value of the escape

attempt was lessened due to defendant's other charges. See *People v. Ligon*, 15 Ill. App. 3d 746, 751 (1973).

¶ 39 In addition to finding that probative value of the attempted escape evidence was high, we find that the prejudicial impact of the escape evidence was low. That is, evidence that defendant wished to escape from jail and acquired various items of contraband including hacksaw blades to do so was unlikely to inflame the passions of the jury. This is especially true when compared with the strong evidence of the relatively more heinous offense of attempted murder. Kameron testified that defendant, who had been his friend since childhood, shot him multiple times in an abandoned garage. The testimony of police officers confirmed that Kameron adamantly claimed that defendant was his shooter immediately after the shooting. Kameron's, Granvil's, and Robertson's testimony tended to establish defendant's motive for shooting Kameron—namely, that he had been paid to do it.

¶ 40 Thus, due to the high probative value and low prejudicial impact of the attempted escape, we find that the trial court did not abuse its discretion in allowing the evidence of defendant's escape attempt. The amount of escape evidence presented did not greatly exceed what was necessary to establish the escape attempt such that a trial within a trial occurred. See *Boyd*, 366 Ill. App. 3d at 94.

¶ 41 In coming to this conclusion, we reject defendant's reliance on *People v. Nunley*, 271 Ill. App. 3d 427 (1995), *People v. Bedoya*, 325 Ill. App. 3d 926 (2001), *People v. Richee*, 355 Ill. App. 3d 43 (2005), and *People v. Thigpen*, 306 Ill. App. 3d 29 (1999), in support of his argument that his conviction should be reversed because the admitted evidence of his escape attempt was too extensive. Initially, we note that none of those cases involved other-crimes evidence of escape or other-crimes evidence showing consciousness of guilt. *Nunley*, 271 Ill. App. 3d at 432 (other-crimes evidence admitted to show the "continuing narrative" of the defendant's arrest and confession); *Bedoya*, 325 Ill. App. 3d at 939-40 (intent); *Richee*, 355 Ill. App. 3d at 58-59 (*modus operandi*); *Thigpen*, 306 Ill. App. 3d at 36 (common plan or scheme). Additionally, all four of defendant's cited cases, unlike the instant case, either found the other-crimes evidence to lack probative value or be unduly prejudicial.

¶ 42 In *Bedoya* and *Richee*, the courts first found that the other-crimes evidence at issue was irrelevant to the purpose for which it was admitted and should not have been admitted at all. *Bedoya*, 325 Ill. App. 3d at 939-40; *Richee*, 355 Ill. App. 3d at 58-59. Both cases found in the alternative that even assuming the other-crimes evidence was relevant, the probative value of the evidence was outweighed by its prejudicial impact due to the excessive amount of evidence presented at trial and its inflammatory nature. *Bedoya*, 325 Ill. App. 3d at 939-40 (other-crimes evidence that the defendant shot at three buildings, including the residence of a cardinal); *Richee*, 355 Ill. App. 3d at 58-59 (other-crimes evidence of multiple burglaries).

¶ 43 Similarly, in *Thigpen*, a murder case, the trial court found that some other-crimes evidence that defendant had previously committed a double murder may have been relevant to show a common plan or scheme. *Thigpen*, 306 Ill. App. 3d at 37-38. The court held, however, the detailed evidence of the double murder that was admitted at trial—including the introduction of a photograph of the victims' corpses, which was subsequently sent to the jury room—was not relevant. *Id.* It was not only the *amount* of evidence of the double murder that the court found constituted reversible error, but the *inflammatory and prejudicial effect* of detailed evidence of a double murder on the jury. *Id.* at 38-39.

¶ 44　　In *Nunley*, extensive other-crimes evidence that the defendant was under arrest for stabbing his mother and killing her dog at the time he confessed to the robbery and murder for which he was on trial was admitted to show the "continuing narrative" of the defendant's arrest and confession. *Nunley*, 271 Ill. App. 3d at 432. On review, the *Nunley* court held that due to the "extremely inflammatory nature of the prior conduct evidence," it was an abuse of discretion to allow other-crimes evidence beyond the fact that defendant was in custody for the aggravated battery of his mother at the time of his confession. *Id.*

¶ 45　　In the instant case, unlike in *Bedoya*, *Richee*, and *Thigpen*, all the other-crimes evidence was relevant to the purpose for which it was introduced, that is, to show defendant's consciousness of guilt by way of his attempted escape from jail. Unlike in *Nunley*, *Bedoya*, *Richee*, and *Thigpen*, the other-crimes evidence in this case—namely, that defendant planned to escape from jail and possessed contraband items in connection with his attempted escape—was not particularly inflammatory or unduly prejudicial. Additionally, the evidence of the escape attempt in the instant case was largely based on inferences drawn from defendant's statements, actions, and the surrounding circumstances. Consequently, a greater amount of evidence was needed to show the escape attempt in this case than in *Nunley*, *Bedoya*, *Richee*, and *Thigpen*, where the other-crimes evidence at issue was either completely irrelevant or could serve its relevant purpose in small amounts.

¶ 46　　Lastly, even if we were to accept defendant's argument that an excessive amount of evidence was presented regarding the escape attempt, we find that any error in the admission of the escape evidence was harmless. We acknowledge that the jury requested to view the transcript of defendant's conversation with Abbey during deliberations. However, in light of the overwhelming evidence of defendant's guilt, we do not believe that the result of the proceedings would have been different even if no evidence of the escape attempt had been presented. *People v. McKown*, 236 Ill. 2d 278, 311 (2010) ("Error will be deemed harmless and a new trial unnecessary when 'the competent evidence in the record establishes the defendant's guilt beyond a reasonable doubt and it can be concluded that retrial without the erroneous admission of the challenged evidence would produce no different result.' " (quoting *People v. Arman*, 131 Ill. 2d 115, 124 (1989))). Additionally, we are mindful of the decisions in *People v. McKibbins*, 96 Ill. 2d 176, 186-87 (1983), and *Bartall*, 98 Ill. 2d at 315, where the court held that no prejudicial error occurred where an excessive amount of relevant other-crimes evidence was admitted at trial.

¶ 47　　　　　　　　　　　　　　　II. Fines and Fees

¶ 48　　Defendant argued in his appellate brief that this matter should be remanded to the trial court for entry of a proper order of fines and fees because the circuit clerk improperly assessed fines against defendant after it was too late to challenge them. The State conceded that the matter should be remanded for the trial court to address the issues defendant raised regarding the fines and costs assessed against him. However, after the filing of the appellant's brief in this case, our supreme court issued its opinion in *People v. Castleberry*, 2015 IL 116916. Defendant now contends that *Castleberry* abrogated the procedure of remanding cases for the proper imposition of fines and fees. For the reasons that follow, we agree.

¶ 49　　Prior to *Castleberry*, the appellate court could correct an illegally low sentence to conform with minimum statutory requirements without running afoul of Illinois Supreme

Court Rule 615(b)(4), pursuant to the void sentence rule—*i.e.*, the rule that a sentence that does not conform to statutory requirements is void. *People v. Arna,* 168 Ill. 2d 107, 113 (1995), *abrogated by Castleberry*, 2015 IL 116916. In *Castleberry*, however, the supreme court abolished the void sentence rule. *Castleberry*, 2015 IL 116916, ¶ 19.

¶ 50    *Castleberry*'s holding applies to the instant case, as it was pending on appeal when *Castleberry* was decided. See *People v. Granados*, 172 Ill. 2d 358, 365 (1996) ("As a general rule *** this court's decisions apply to all cases that are pending when the decision is announced, unless this court directs otherwise."); see also *Griffith v. Kentucky*, 479 U.S. 314, 328 (1987) ("We therefore hold that a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final ***.").

¶ 51    After *Castleberry*, we may no longer remand a cause to the trial court for the imposition of an increased sentence, even if the sentence given by the trial court is illegally low. See *Castleberry*, 2015 IL 116916, ¶¶ 20-26 (holding that the appellate court was without authority to add a 15-year firearm enhancement to the defendant's sentence pursuant to Illinois Supreme Court Rule 615(b)(4) even though the sentence was illegally low without the enhancement). Fines are part of a criminal sentence. *People v. Graves*, 235 Ill. 2d 244, 250 (2009). Therefore, we will merely vacate improperly imposed fines rather than remanding for the reimposition of such fines. We now turn to the question of whether any fines were improperly imposed in this case.

¶ 52    "Because the imposition of a fine is a judicial act, and the circuit clerk has no authority to levy fines, any fines imposed by the circuit clerk are void from their inception." *People v. Larue*, 2014 IL App (4th) 120595, ¶ 56. We find that the following fines were imposed by the circuit clerk and are therefore void: (1) the $50 court fund fee (*People v. Smith*, 2013 IL App (2d) 120691, ¶ 21); (2) the $5 youth diversion fee (*Graves*, 235 Ill. 2d at 255); (3) the $4.75 drug court fee and the $0.25 "Clerk Op Deduction" (*People v. Johnson*, 2015 IL App (3d) 140364, ¶ 9); (4) the $15 State Police Operations Assistance Fund fee (*People v. Millsap*, 2012 IL App (4th) 110668, ¶ 31); (5) the $25 Violent Crime Victims Assistance Fund fine (*People v. Dillard*, 2014 IL App (3d) 121020, ¶ 11); and (6) the $10 medical costs fine (*Johnson*, 2015 IL App (3d) 140364, ¶ 9). Accordingly, we vacate the foregoing fines.

¶ 53    We also find that a $30 juvenile records expungement fine was improperly imposed in this case. Section 5-9-1.17 of the Unified Code of Corrections (730 ILCS 5/5-9-1.17 (West 2012)) provides:

"(a) There shall be added to every penalty imposed in sentencing for a criminal offense an additional fine of $30 to be imposed upon a plea of guilty or finding of guilty resulting in a judgment of conviction.

(b) Ten dollars of each such additional fine shall be remitted to the State Treasurer for deposit into the State Police Services Fund to be used to implement the expungement of juvenile records as provided in Section 5-622 of the Juvenile Court Act of 1987, $10 shall be paid to the State's Attorney's Office that prosecuted the criminal offense, and $10 shall be retained by the Circuit Clerk for administrative costs associated with the expungement of juvenile records and shall be deposited into the Circuit Court Clerk Operation and Administrative Fund."

¶ 54    This assessment is a fine, as it is punitive in nature. *People v. Wynn*, 2013 IL App (2d) 120575, ¶ 16. Because the fine was imposed without authority by the circuit clerk in this

- 10 -

case, it is void. See *Larue*, 2014 IL App (4th) 120595, ¶ 56. In the instant case, this $30 fine appears in three places on the clerk's cost sheet: (1) the $10 State Police Services Fund assessment, (2) the $10 "Clerk Op Add-Ons" assessment, and (3) as a portion of the $50 State's Attorney fee. Accordingly, we vacate the $10 State Police Services Fund assessment, the $10 "Clerk Op Add-Ons" assessment, and $10 of the $50 State's Attorney fee, thereby reducing the State's Attorney fee to $40.

¶ 55    Defendant also argues that the probation operations assistance fee is a fine because it does not compensate the State or county for the costs of prosecuting a particular defendant but rather is a flat amount imposed upon conviction regardless of the amount of probation services used by defendant. Defendant further argues that the imposition of the probation operations assistance fee violates *ex post facto* principles because its effective date was subsequent to the date of the offense. Section 27.3a(1.1) of the Clerks of Courts Act (705 ILCS 105/27.3a(1.1) (West 2012)), which establishes the probation operations assistance fee, states as follows:

> "Starting on July 6, 2012 (the effective date of Public Act 97-761) and pursuant to an administrative order from the chief judge of the circuit or the presiding judge of the county authorizing such collection, a clerk of the circuit court in any county that imposes a fee pursuant to subsection 1 of this Section shall also charge and collect an additional $10 operations fee for probation and court services department operations.
>
> This additional fee shall be paid by the defendant in any felony, traffic, misdemeanor, local ordinance, or conservation case upon a judgment of guilty or grant of supervision, except such $10 operations fee shall not be charged and collected in cases governed by Supreme Court Rule 529 in which the bail amount is $120 or less."

¶ 56    We determine that this assessment is overall a fine. "Broadly speaking, a 'fine' is a part of the punishment for a conviction, whereas a 'fee' or 'cost' seeks to recoup expenses incurred by the state—to 'compensat[e]' the state for some expenditure incurred in prosecuting the defendant." *People v. Jones*, 223 Ill. 2d 569, 582 (2006). "[T]he most important factor [in determining whether a charge is a fine or fee] is whether the charge seeks to compensate the state for any costs incurred as the result of prosecuting the defendant." *Graves*, 235 Ill. 2d at 250. "Other factors to consider are whether the charge is only imposed after conviction and to whom the payment is made." *Id.* at 251. The probation operations assistance fee is assessed against all criminal defendants "upon a judgment of guilty or grant of supervision" regardless of whether probation services were actually utilized in each defendant's case. 705 ILCS 105/27.3a(1.1) (West 2012). As such, we conclude the probation operations assistance assessment qualifies as a fine, created to generate a fund to support probation and court services, regardless of a defendant's actual utilization of those services.

¶ 57    In reaching our conclusion, we recognize that our approach is contrary to the holding of *People v. Rogers*, 2014 IL App (4th) 121088, ¶ 37. In *Rogers*, the court held that a probation operations assistance assessment was compensatory in nature—and, consequently, a fee rather than a fine—because the defendant received a sentence of probation and the probation office prepared a presentence investigation report. *Id.* The *Rogers* court found, however, that the probation operations assistance fee would be a fine in cases where the probation office was not involved in a defendant's prosecution. *Id.* ¶ 38. We decline to follow *Rogers*.

¶ 58        Having found the probation operations assistance fee to be a fine, we find that it is void because it was improperly assessed by the circuit clerk. *Larue*, 2014 IL App (4th) 120595, ¶ 56. Additionally, the imposition of the fine violates *ex post facto* principles because the date of the offense—August 30, 2010—was prior to the effective date of the legislation that created the fine—July 6, 2012. Pub. Act 97-761 (eff. July 6, 2012) (adding 705 ILCS 105/27.3a(1.1) (West 2012)). See *People v. Prince*, 371 Ill. App. 3d 878, 880 (2007) ("A fine *** is a pecuniary punishment imposed as a part of a criminal sentence and is subject to the prohibition against *ex post facto* laws.").

¶ 59        Defendant argues that the $250 DNA analysis fee imposed by the circuit clerk was improper because he previously provided a DNA sample as a result of a prior conviction. "[S]ection 5-4-3 [of the Unified Code of Corrections (730 ILCS 5/5-4-3 (West 2008))] authorizes a trial court to order the taking, analysis, and indexing of a qualifying offender's DNA, and the payment of the analysis fee only where that defendant is not currently registered in the DNA database." *People v. Marshall*, 242 Ill. 2d 285, 303 (2011). At defendant's request, we take judicial notice of a document from the Illinois State Police Division of Forensic Services showing that he had previously submitted a DNA specimen, which defendant included in the appendix to his appellate brief. See *People v. Garrett*, 62 Ill. 2d 151, 163 (1975) (holding that the appellate court may take judicial notice of the contents of public records). Accordingly, we vacate the $250 DNA fee assessed in this case, as defendant has already submitted a DNA specimen. See *Marshall*, 242 Ill. 2d at 303.

¶ 60        We find that the remaining assessments, which total $197, were fees properly imposed by the circuit clerk: (1) the $100 clerk fee (705 ILCS 105/27.1a(w)(1)(A) (West 2012)); (2) the $30 State's Attorney fee and $10 preliminary hearing fee, for a total of $40 (55 ILCS 5/4-2002(a) (West 2012)); (3) the $15 automation fee (705 ILCS 105/27.3a(1) (West 2012)); (4) the $25 judicial security fee (55 ILCS 5/5-1103 (West 2012)); (5) the $15 document storage fee (705 ILCS 105/27.3c(a) (West 2012)); and (6) the $2 State's Attorney automation fee (55 ILCS 5/4-2002(a) (West 2012)).

¶ 61                                              CONCLUSION

¶ 62        We affirm the judgment of the circuit court of Rock Island County in part, vacate in part as to the fines imposed by the circuit clerk and the $250 DNA analysis fee, and remand for the trial court to enter a modified judgment on fines, fees, and costs in accordance with this order.

¶ 63        Affirmed in part, vacated in part, and remanded with directions.

¶ 64        JUSTICE McDADE, specially concurring.

¶ 65        I agree with Justice Carter that existing Illinois law requires a holding that the circuit court did not err when it admitted the other-crimes evidence regarding the defendant's activities while in the Rock Island county jail. I also agree with Justice Carter that those assessments properly characterized as fines and the $250 DNA fee should be vacated for the reasons stated and that the other fees were properly imposed. I write separately to express my strong disagreement with the propriety of using the concept of consciousness of guilt in the context of incarceration.

¶ 66    I recognize that the supreme court has consistently demonstrated its belief in the concept, but I believe that evidence related to an escape or an attempted escape from incarceration should not be admissible at a defendant's trial as evidence of consciousness of guilt for multiple reasons. As a general premise, I find consciousness of guilt to be a flawed concept in any context because it runs afoul of the foundational principle of our jurisprudence that a criminal defendant is presumed innocent until proven guilty. More specifically, to be used as consciousness of guilt of the charged offense, evidence that one has escaped or attempted to escape from incarceration invites—indeed, requires—the fact-finder to presume that the individual is guilty of that underlying crime.

¶ 67    The consciousness-of-guilt concept also offends logic in that its operation is circular. In the instant case, for example, in order to serve as proof of the defendant's guilt of the charged crime, the concept requires the fact-finder to presume his unproven guilt and find that his conduct at the jail—arguably an attempt to escape—was solely motivated by his awareness of that guilt. This is a logical fallacy.

¶ 68    But I am certainly not alone in questioning the validity of the concept and its use in the courts. While consciousness of guilt has long been accepted as admissible evidence, the problematic nature of the concept has also long been recognized. See, *e.g.*, Robert M. Hutchins & Donald Slesinger, *Some Observations of the Law of Evidence—Consciousness of Guilt*, 77 U. Pa. L. Rev. 725 (1929) (critiquing consciousness of guilt for being scientifically unverifiable and citing, *inter alia*, John Henry Wigmore's treatise on evidence and his book, The Principles of Judicial Proof (1913)). Context is extremely important when consciousness-of-guilt evidence is proffered:

> " 'The same symptom is often the result of exactly opposite psychological conditions. This sort of evidence is admitted because there is a certain degree of uniformity in its meaning, but the variations from uniformity are so frequent, and depend so much upon personal character and local circumstances that *no fixed rules should be laid down*. Repeated judicial warnings tell us that the evidence is merely to be estimated as best we can in the light of our knowledge of human nature in general and of the accused in particular. … The general principle, as applied to the conduct of one accused of crime, finds illustration in a great variety of instances. In those which have led to judicial rulings, there has seldom resulted an exclusion, because usually none but conduct having at least plausibly a guilty significance is commonly offered.' " *Id.* at 728-29 (quoting John Henry Wigmore, A Treatise on the Anglo-American System of Evidence in Trials at Common Law § 273 (2d ed. 1923)).

Additionally, it was noted as early as 1846 that the flight of an accused:

> "is not necessarily an admission of guilt; it may proceed from an unwillingness to stand a public prosecution, or from a fear of the result, from an inability to explain certain false appearances, indicating guilt, though the party was innocent. *The conduct of one accused of crime, is the most fallible of all competent testimony*. Those emotions or acts which might be produced in one person by a sense of guilt, or by the stings of conscience, might be exhibited by another, differently constituted, by an overwhelming sense of shame, and the degradation consequent upon a criminal accusation. The same cause producing opposite effects in different persons, owing to weakness or strength of nerve, and other inexplicable moral phenomena." (Emphasis added.) *Smith v. State*, 9 Ala. 990, 995 (1846).

Even if one (like Wigmore) is not troubled by the inability to scientifically verify consciousness of guilt, notable objections to its use in the courts include that "its manifestations are equivocal; [citation] it may be caused by guilt of another crime than the one charged; [citation] or it may be caused by other emotional disturbances [citation]." Hutchins & Slesinger, *supra*, at 734.

¶ 69    Particular to the prison context, I find such evidence problematic because there are a multitude of reasons why an individual may attempt to escape from incarceration that are wholly unrelated to whether he or she committed the charged offense. In this regard, I note Justice Seymour Simon's dissent in *People v. Gacho*, 122 Ill. 2d 221 (1988). In *Gacho*, a defendant had been arrested and incarcerated based on his suspected involvement in the murders of two people. *Id.* at 231. While incarcerated, he wrote a letter to his girlfriend that included the statement, " 'I still believe I can escape from here one way or the other.' " *Id.* at 245. The supreme court held that the statement from the letter was admissible at trial as consciousness-of-guilt evidence. *Id.* at 246. Justice Simon dissented, in part due to the fact that the two cases cited by the majority (*People v. Gaines*, 88 Ill. 2d 342 (1988) and *People v. Harper*, 36 Ill. 2d 398 (1967)) involved actual escapes or attempts to escape, which was not the case in *Gacho*. *Id.* at 265 (Simon, J., dissenting). Justice Simon then stated:

> "Here, the defendant was simply writing about the possibility of leaving prison sometime in the future. He may have meant that he thought he would be found innocent and be released or he may have been thinking of escaping because of harsh conditions in prison. In any case, his statement is not relevant to the issue of whether he is guilty of murder, and permitting the State to cross-examine the defendant about the statement was reversible error." *Id.*

¶ 70    I recognize that case law states that whether an escape or an attempted escape was motivated by consciousness of guilt or by some other reason is a question for the fact-finder to decide. See, *e.g.*, *People v. Sheridan*, 51 Ill. App. 3d 963, 967 (1977). However, as I stated above, considering, even as a broader inquiry, whether evidence of an actual or attempted escape shows consciousness of guilt requires the fact-finder to presume that the defendant is guilty of the underlying offense. Moreover, it is also dangerous to allow the evidence because of the likelihood of it being used as evidence of a defendant's general bad character, rather than evidence of his or her consciousness of guilt for the charged offense.

¶ 71    The problematic nature of such evidence is exacerbated in a case like the one before us. Here, whether the defendant's actions even constituted an escape attempt were particularly suspect. First, at the time the defendant was transferred to the Rock Island County jail to face the charges in this case, he had been incarcerated on a federal charge. He was also facing other state criminal charges. Any purported plan to escape could have been an attempt to evade any or all of those charges and not the instant aggravated battery with a firearm charge. Second, it is not at all clear that the defendant was even planning an escape. His actions—including his recorded statements—could as easily have been the implementation of an operation to smuggle drugs into the jail as an attempt by the defendant to escape from it.

¶ 72    Unfortunately, despite long-standing doubts of legal scholars and judges about the general validity of the concept of consciousness of guilt and, more specifically about the reliability of its application in the context of actual or attempted escapes from incarceration, I am compelled to concur with the decision to affirm the defendant's conviction.

¶ 73     JUSTICE WRIGHT, dissenting.

¶ 74     I respectfully dissent on the issue of the admissibility of the other-crimes evidence in this case. I would find the excessive other-crimes evidence constitutes reversible error arising out of a trial within a trial.

¶ 75     I am not persuaded by the case law relied on by the majority. First, many of the cases cited in the majority decision involve prearrest flight to avoid arrest. I distinguish those cases on the grounds that this defendant did not attempt to flee in order to avoid arrest. Instead, this defendant voluntarily requested to be returned to Rock Island County, from federal prison, to answer to two outstanding Rock Island County warrants.

¶ 76     Next, I also distinguish three of the decisions cited by the majority that are more analogous to the facts in this appeal because those cases involve a postarrest escape. In the oldest postarrest case, *People v. Talbe*, 321 Ill. 80, 86 (1926), defendant was arrested, placed in the local jail, and then forcefully removed the jailer's keys before leaving his jail cell without permission. Similarly, in *People v. Gambino*, 12 Ill. 2d 29, 32 (1957), defendant was first arrested, placed in the local jail, and then left the jail itself without permission. I do not find these two cases to be helpful because this defendant did *not* physically depart from either his Rock Island jail cell or the Rock Island County jail, without permission, at any time.

¶ 77     A third case cited by the majority, *People v. Yonder*, 44 Ill. 2d 376 (1969), appears to be on all fours with the facts in the case now before this court. For example, both the facts in the case at bar and the facts in *Yonder* involved an inmate who was discovered to be in possession of hacksaw blades while incarcerated in the jail and awaiting trial.

¶ 78     However, upon closer examination, I submit the holding in *Yonder* does not provide persuasive authority in this appeal. Specifically, in *Yonder*, the defense challenged the correctness of the trial court's evidentiary ruling extending the reach of consciousness of guilt evidence to apply where the correctional officers thwarted the plan to escape before the inmate began to execute an escape. *Id.* at 392.

¶ 79     In *Yonder*, unlike the case at bar, the jury received minimal evidence showing Yonder possessed hacksaw blades in his shoes while in jail. The evidence linking defendant to the hacksaw blades paled in comparison to the extensive evidence the jurors received pertaining to the armed robbery. In that case, the State's accomplice witnesses and the victims described for the jury how Yonder woke up the family by attacking the husband as he slept. The armed robbers, including Yonder, then dragged the other household occupants out of bed; bound them with tape; gouged out the eyes of the husband causing blindness; forced the wife to witness her husband's mutilated face; threatened to cut off the wife's finger to remove her ring; announced an intent to have a "sex orgy" with the couple's 11-year-old son; and encouraged the others to continue to beat, injure, and burn the women present in the home by applying cigarettes to their breasts and pubic hairs while "lying naked" on their backs. Further, the jury learned that the armed robbery yielded $130 in cash, two pairs of pearls, and a ring.

¶ 80     Not surprisingly, our supreme court engaged in a cursory analysis in *Yonder*, which explained that, in that particular case, the possession of hacksaw blades was admissible evidence showing consciousness of guilt. Here, defendant concedes in his brief on this appeal that the trial court correctly decided some *limited* evidence of consciousness of guilt could be

introduced by the State in their case-in-chief. However, unlike *Yonder*, defendant agues the details of the escape plan, which this jury received, became quite excessive and prejudicial.

¶ 81    Here, the State's theory was that defendant did not simply acquire and possess contraband while housed in the Rock Island County jail but, rather, acquired the various items of contraband, not limited to the hacksaw blades, as part of a bigger plan to escape from the jail. In support of the State's escape theory, this jury received 16 photographic exhibits depicting contraband found in common day areas of the jail and other evidence discovered outside the jail below defendant's window.

¶ 82    Further, the jury learned about defendant's 14 recorded telephone calls from the jail where defendant made incriminating statements about getting cell phone access and other unspecified contraband to defendant. Finally, the jury heard one recording of a visitation between defendant and his girlfriend that took place on June 8, 2013. During this conversation, defendant dramatically advised his girlfriend that he might not be in jail "next month" and promised they would be "going off in the sunset together." Yet, it is undisputed that defendant's prediction did not come true and he remained in jail the next month. Thus, the issue of whether defendant actually intended to escape or was expressing simple bravado on June 8, 2013, created a trial within a trial documented by the jurors' request to review a transcript of the conversation on June 8, 2013.

¶ 83    I also distinguish the facts in *Yonder* from the instant case because, here, the jury did not learn that this defendant may have been planning his escape to avoid *returning* to federal prison to serve the balance of a 10-year sentence. For obvious reasons, defendant could not counterbalance the excessive other-crimes evidence—about possessing contraband in a penal institution while hoping to escape—by informing the jury of an equally plausible reason for his desire not to return to federal prison to complete a 10-year sentence.

¶ 84    Had the State limited the evidence to the items and physical evidence found in defendant's cell on July 27, 2013, I could adopt the majority's harmless error analysis. However, my views are premised on the excessive amount of evidence the State elected to introduce, in spite of the court's warning to minimize the evidence of escape long before the trial began. I dissent. Finally, with respect to fines and costs, I agree in the majority's analysis of the application of *Castleberry*, 2015 IL 116916, to the case at bar. I also agree with the majority's view of the decision in *Rogers*, 2014 IL App (4th) 121088.

¶ 85    I strongly agree with the majority that *Castleberry* bars this court's prior practice of remanding cases to the trial court with instructions to add the statutorily required fines originally omitted by the sentencing judge. *Yet*, I respectfully dissent because I would not adjust or reduce the amounts included in the clerk's tally sheet as a "void" component of defendant's sentence.

¶ 86    In *People v. Castleberry*, 2015 IL 116916, ¶ 19, our supreme court wisely abolished the void sentence rule. In doing so, our supreme court clarified that a void sentence exists only where the trial court lacked jurisdictional authority to enter an erroneously low (or high) sentence and judgment against defendant. In this case, the defendant does not assert the trial court lacked jurisdictional authority to order the payment of costs only for purposes of this appeal. I contend this court should not correct the circuit clerk's errors when the trial court has not been requested to do so. This does not mean defendant is without a remedy in this case.

¶ 87    I note that either the State or a defendant may file a writ of *mandamus* directed to the circuit clerk. *Mandamus* is the proper method for any trial court to be instructive to the circuit clerk. Alternatively, I respectfully suggest either party could present an agreed bench order for the trial court to sign, which clarifies those amounts recognized by existing case law as true court "costs." Either approach would result in a reduction of costs for purposes of the clerk's records.

¶ 88    For these reasons, I would affirm the defendant's sentence including court "costs" and encourage the parties to initiate any request to correct the clerk's tally sheet in the trial court.