2024 IL App (1st) 220976-U

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

FIRST DIVISION
June 10, 2024

No. 1-22-0976

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 19-CR-9422 |
| | ) | |
| JOSHUA BARBEE, | ) | The Honorable |
| | ) | Brian Flaherty, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court. Justices Pucinski and Coghlan concurred in the judgment.

**ORDER**

¶ 1    *Held:* The appellate court affirms the defendant's conviction and sentence for aggravated criminal sexual assault and aggravated battery.

¶ 2    Following a jury trial, defendant Joshua Barbee was convicted of aggravated criminal sexual assault and aggravated battery. He was found not guilty of aggravated kidnapping. He was sentenced to 17 years on the aggravated criminal sexual assault conviction and 4 years on the aggravated battery conviction, to run consecutively. Defendant appeals, raising five principal contentions: (1) that the evidence was insufficient to prove him guilty beyond a reasonable doubt, due to the impeached and incredible testimony of the complaining witness; (2) that the trial court

improperly excluded evidence concerning the probation status of the complaining witness; (3) that the trial court erred by admitting evidence of the circumstances of his arrest; (4) that the trial court erred in refusing to instruct the jury that it could consider the age of the complaining witness only for purposes of assessing her credibility; and (5) that the conviction for aggravated battery should be vacated under one-act, one-crime principles. Defendant requests that we reverse his convictions outright or, alternatively, that we reverse and remand for a new trial and vacate the conviction for aggravated battery. For the reasons that follow, we affirm.

¶ 3                                               I. BACKGROUND

¶ 4        Defendant was initially charged with two counts of aggravated kidnapping, four counts of aggravated criminal sexual assault, one count of kidnapping, and one count of aggravated battery. The charges arose out of events alleged to have occurred on the night of September 21, 2018, involving a victim named D.Y., then 16 years old. Prior to trial, the State nol-prossed five of these counts. A jury trial thus proceeded on one count for aggravated kidnapping based on criminal sexual assault; one count for aggravated criminal sexual assault alleging an act of sexual penetration upon D.Y. by contact between defendant's penis and her mouth by the use of force or threat of force, in such manner as to threaten or endanger her life; and one count of aggravated battery based on the strangling of D.Y. Defendant pursued a defense of consent.

¶ 5        Prior to trial, both parties filed motions *in limine* pertaining to the facts and circumstances of defendant's arrest on the charges at issue. Defendant's motion sought to limit the evidence to the date, time, and location of arrest; the State's motion sought to allow all circumstances regarding defendant's arrest into evidence. In summary, these motions indicated that defendant was arrested at a McDonalds restaurant on June 13, 2019. He resisted arrest and made statements to the effect of " 'you're going to have to shoot me.' " In addition to the arrest warrant in this case, two other

outstanding warrants concerning unrelated matters existed for defendant. Defendant argued that it was irrelevant and prejudicial to use this evidence to show consciousness of guilt as to this case, as his acts of resistance were more likely related to one or both of the other warrants than to this case, of which it could not be shown he had knowledge. The trial court ruled that the facts of the arrest were relevant and admissible but that they could not be used to argue consciousness of guilt.

¶ 6      During a discussion of issues for trial following jury selection, defendant's counsel informed the court that the defense intended to introduce evidence that, at the time of the events in question, D.Y. was on probation for a juvenile delinquency adjudication. Counsel asserted that the probation records showed that D.Y.'s mother had previously complained to the probation officer that D.Y. was staying out all night and disobeying rules; in response, probation had admonished D.Y. that she needed to follow her mother's rules, one being a 10 p.m. curfew put in place by D.Y.'s mother. Counsel argued that the fact that D.Y. knew she was on probation and could get in trouble with probation for violating her mother's curfew rules provided D.Y. with a motive to lie about the reason she had stayed out all night. The trial court ruled that the fact that D.Y. was on probation was not relevant, as any term and condition of probation that required her to obey rules imposed by her mother had no legal force or effect.

¶ 7      The State's first witness at trial was D.Y. She testified that as of September 21, 2018, she was 16 years old and lived with her mother and sister in East Chicago, Indiana. She had a cell phone that was enabled for use only through wi-fi, so she used Facebook Messenger to communicate on it. That night, she communicated via Facebook Messenger with her friend Kywon to go to the movies. When Kywon arrived in his car to pick her up, he had another person with him in the car. When asked if she saw that other person who had been in the car in the courtroom that day, D.Y. answered "No." She was then shown two photographs, and she identified that one showed Kywon

and herself and that the second one showed a man she knew as "Josh." The two photographs were admitted into evidence and published to the jury.

¶ 8        D.Y. testified that after she entered the car, the three of them smoked a blunt. They stopped at Walmart and a food place before going to a motel in Lansing, Illinois. She testified that she believed the reason they were stopping at the motel was because one of the men needed to retrieve something before going on to the movies. D.Y. went with them to the motel room. She explained that she sat on a bed and ate some food while talking to Kywon, who was sitting also. She stated that they were probably smoking. Shortly after, Kywon stated that he needed to go somewhere and would be right back, and then he left.

¶ 9        D.Y. was then alone in the motel room with Josh, who had previously been in a different room but returned and sat next to her. D.Y. testified that at first, they were just talking; but at some point, Josh began choking her with his hands. She could not remember if Josh said anything as he was choking her, but she felt very weak and was unable to talk or breathe. She testified that she did not do anything to defend herself, but she had a bowel movement. Her clothes were on at the point when Josh was choking her, but thereafter they came off because she "had messed them up."

¶ 10        She testified that after that, Josh "kept forcing me to like give him oral sex." She was on the floor at that point, his clothes were off, and "he was shoving [his penis] in my mouth." She testified that it "would like get hard and go soft and get hard again," and this went on for hours. At some point she ended up back on the bed, where Josh "kept like strong-arming me to lay down." She explained that this meant he was "using all his force to keep me down on the bed." She testified that her clothes were on at that point, and she could not remember if this was before or after he choked her. She testified that when she was on the bed, Josh "was like in front of me, like in a position to be on top of me." He was using his hands to try to remove her clothing, which was a

one-piece with pins, and he kept trying to feel her vagina through her clothes. She cannot remember if he was successful. She testified that "[h]e was trying to actually have sex," that she kept asking him to stop, and that he did not stop. She testified that his penis was not anywhere else on her body other than her mouth. She testified that he had her perform oral sex on him for "a couple of hours," as she remembered noticing the clock at 9 p.m. and again at 1 a.m. She could not remember when it stopped.

¶ 11 She testified that at one point, she was on the floor between the beds while Josh was standing over her. He was "punching me, slapping me," but she cannot remember what he was saying then. She testified that it all stopped at about 10 a.m. She kept telling him she was tired. Around this time, Josh attempted several phone calls to Kywon, telling him to come back. After Josh got in contact with Kywon, D.Y. asked Josh if she could call her mother. Josh allowed her to use his phone to do so. She made the call on speakerphone. When her mother answered, D.Y. told her mother that she needed to come get her. D.Y. testified that Josh then said to her that if she told her mother where she was, "he was going to do something," although that was not a word-for-word quote. The call with her mother then ended.

¶ 12 Kywon arrived at the motel room, and he and Josh made D.Y. take a shower in the bathroom. She testified that someone put her clothes into a plastic bag. Kywon gave her a pair of men's underwear and some basketball shorts to put on, and she also put on a button-up shirt she had been wearing. They did not leave right away. Instead, Kywon kept talking to her (with Josh in the room) about what she was going to say when she got home; she answered that she was not going to say anything. She testified that she kept asking Kywon to take her home. The three of them eventually left the motel room and went to the car. She remembers that Kywon was driving and stopped several places before he actually took her home. Her neck was hurting at that point.

¶ 13    When she arrived home, her sister was present. Her mother came home shortly after, and D.Y. told her mother what had happened. Her throat was hurting badly at that time. She was taken to the hospital, and a nurse performed a sexual assault kit on her.

¶ 14    D.Y. testified that soon after this event, she received a message on Facebook from an account with a profile photo that she recognized as Josh. That message stated, "[D.Y.], I hope you all right. I've been concerned about you. Just let me know you cool. I know you probably hate me, but you've been on my mind heavy. Let me know something." D.Y. did not respond, and she never saw Josh again after that day.

¶ 15    On October 3, 2018, D.Y. underwent a forensic interview by staff of La Rabida Children's Hospital (La Rabida). D.Y. did not initially recall viewing photographs of potential suspects, but then she identified an exhibit as a photo array she viewed during the interview. She identified a photo of Josh as the person who had strangled her. She also agreed that she had given additional details to the interviewer about the incident at issue, including: (1) that as she was begging Josh to stop, he was telling her to shut up, asking her why she would "even come outside with a guy like me," and telling her to "take this as a life lesson," (2) that she knew she had passed out and fallen off the bed because she felt her whole body shaking and knew she was going to sleep, and that she knew she had fainted because she woke back up, (3) that Josh told her to suck his penis until he told her to stop, had his hand on her neck while making her do it, and would punch her if she did not do it right, (4) that he tried to finger her vagina by moving her hand away and pushing her down while touching her private area roughly and "like—trying to get his thing inside of it," (5) that he actually did put three of his fingers inside her vagina and would say things like "just let it happen" as she would tell him to stop, and (6) that Josh had taken her clothes off and thrown them away after she had the bowel movement on herself.

¶ 16	On cross-examination, D.Y. testified that she had only known Kywon for a few weeks before this incident. She was asked who Rayshawn Johnson was, and she answered that he was Kywon's friend, that she always saw him with Kywon, and she knew him only about as well as she knew Kywon. She testified that she did not recall telling the emergency room nurse that Rayshawn Johnson had picked her up from the motel. She testified that she had met Kywon after she had moved to East Chicago about three months prior to this incident, and he stayed up the street from her apartment. He was not someone she talked to frequently on Facebook Messenger, but they had a brief communication on it the night prior to this event. On September 21, 2018, they had the following text communication on Facebook Messenger prior to meeting:

"D.Y.: Wyo [what you on]

Kywon: Abt to grab a room wyo [what you on] you tryna pop put

D.Y.: Pop out to where?

Kywon: Illinois

Kywon: ???

D.Y.: What

Kywon: Dnt wat me shorty wyo [what you on]

D.Y.: Shit trying to smoke

Kywon: Ight, can u move around?

D.Y.: Wym [what you mean]

Kywon: Can u leave from Indiana?

D.Y.: Yeahhh I can

Kywon: Ight, wen u tryna to cum out

D.Y.: Idmmm [it doesn't matter] but where are we going and with who

Kywon: Out [and] with my Bro

Kywon: Can u spend the night out or naw

Kywon: Can't hear u

[23 second Facebook audio call]

Kywon: Were do u go wen I go out

D.Y.: Boy … out where and if I want to

Kywon: To the movies out to eat blowing turn up

D.Y.: Awe yeah

D.Y.: I'm broke baby

Kywon: So wat tha mean?

D.Y.: Who paying for that??

Kywon: Daddy

D.Y.: Awe yeah?

Kywon: Fse [funniest shit ever] yea

D.Y.: Um what time you was trynna do all of this?

Kywon: [8:30 or 9]

D.Y.: Umm alright[.]"

¶ 17    D.Y. testified that in the above exchange, she agreed only to go to the movies or possibly bowling (as she thought "blowing" was a typo by Kywon), not to a motel room. She also thought that Kywon's reference to "my Bro" meant his friend Rich, not Josh. She testified that her mother knew she was going out with some friends, although her mother did not know where or with whom.

When she got to the car, Kywon and Josh were inside. She knew the closest movie theater was in River Oaks. She testified that she had a curfew of 10 p.m., and it was approximately 8:30 p.m. when she was picked up. They went to a fast-food restaurant, where something was purchased for her to eat. She was the only one who got food. She testified that it did not dawn on her that they were not going to a movie theater until after they had gotten the food. They went to a Walmart, where one of the men bought liquor. They also had marijuana. They then proceeded to the motel.

¶ 18        Questioning then turned to the people she had spoken to after the event. The first was her mother. Her mother was upset when D.Y. spoke to her, and D.Y. agreed she did not want her mother to be upset. Her mother called 911. Paramedics arrived, and they took notes while D.Y. spoke with them. They took her to nearby St. Catherine's Hospital, and there she spoke to an emergency room doctor, an emergency room nurse, and later a second nurse. All of them asked her questions about what had happened. And then on October 3, 2018, she gave a recorded interview at La Rabida.

¶ 19        D.Y. testified that she never told her mother that the person who picked her up was named "Spaz." She told her mother that Kywon used the nickname "Spade Royale" on Facebook and that his brother used the nickname "JBDubb." She does not remember if she told the paramedic the names Kywon or Josh. She testified it was not true that she told a nurse that she was picked up by one male and that there was an older male at the motel with her friend.

¶ 20        She testified that the reason she got out of the car was because Kywon was pressuring her to go into the motel room, and she had originally wanted to stay in the car. Several clips of the motel surveillance video were then published, showing D.Y. and Kywon at 9:35 p.m. entering the room, with Kywon carrying a plastic bag in his hand. A clip from 9:37 p.m. showed Josh with multiple bags in his hand. It was apparently played a second time, and D.Y. stated that the person in the

clip was not Josh, as she did not remember Josh wearing a scarf on his head that night. She testified she was eating and smoking in the room, but not drinking. She testified that it was only about 20 minutes until Kywon left, not several hours. She asked Kywon where he was going and whether she could go with him. She testified that she did not take her own clothes off that night, and she does not remember how her clothes came off. She does not remember saying to the paramedics that the older male had ripped her clothes off or used them to choke her. Josh did not in fact use her clothes to choke her.

¶ 21    At some point, a maid came to the door. When that occurred, D.Y. did not alert the maid that she was in the room. She testified that Kywon did not come back to the room until the following afternoon, and she never heard Kywon knocking on the door or window to the room around 7 a.m. She never went to sleep. After Kywon arrived, she showered, and the three of them left together. She did not tell an EMT that she was able to retrieve her phone, that she called a friend to pick her up, or that she ran out of the room when the man was not looking. She possibly told the EMT that her friend dropped her off at her apartment, and this would have referred to Kywon. She does not recall telling the emergency room nurse that she was able to call another friend who picked her up. She did not tell that nurse that she went to the house of the friend who picked her up, that she showered there, and that she was dropped off at home at 8 p.m. She denied telling the second nurse that Josh finally let her leave around 1 p.m., that she walked out of the motel to a furniture store, that she called her friend Rayshawn Johnson to come get her, that he took her to his house to shower and collect herself, that she was still feeling faint at Rayshawn's house, or that he dropped her off at 8 p.m. She reiterated that she never said anything about Rayshawn, and he did not pick her up or take her home. She testified that in addition to performing oral sex, Josh forced her to lick him also. There was no kissing, and she did not tell a nurse that Josh had kissed her. She went

to the emergency room in the underwear and shorts that Kywon had given to her.

¶ 22    She did not recall stopping at a gas station on the way to the motel because they already had a blunt rolled up when she got into the car, and they did not get gas. However, she agreed that she said in her recorded interview that Kywon told Josh to go to a gas station to buy cigars while she and Kywon smoked the blunt. When they left the motel, D.Y. got into the car voluntarily with Kywon and Josh. Initially she did not remember stopping at a gas station on the way home, but she agrees that she said in her recorded interview that they stopped at a gas station and a corner store. She does not remember stopping anywhere else. She did not attempt to get out of the car at the gas station. She is not sure what time they left the motel. All she remembers is that they left the motel in the daytime and that it was dark when she got home.

¶ 23    On redirect examination, she testified that she had been awake for over 24 hours by the time she spoke to the emergency room personnel. She testified that she did not try to run out of the motel room because she was scared, and she did not know what would happen if she tried. She did not think Josh would have allowed her to leave. He had the door guarded with a chair, and he had already strangled her. She did not want to put up a fight, as she was afraid something worse could happen to her. She testified that she did not scream in the parking lot because she just wanted to get home, and Kywon was taking her home. She felt okay as long as Kywon was there, but she was scared of Josh by that point.

¶ 24    She testified that she told her mother that the way she had gotten home was that Kywon and Josh had dropped her off. As to her curfew, she testified that she and her mother had an agreement for her to come inside at 10 p.m. on weekdays, but as long as her mother sees her come in to stay in, she did not get in trouble. It was not strict that she had to be in by 10 or 10:30. She testified that she is not making any of this up because she was afraid of getting in trouble for her curfew. When

she spoke to the medical personnel on Saturday evening, she told them that she was forced to perform oral sex and was strangled. She also complained to them of throat pain.

¶ 25    At that point of trial, a sidebar occurred in which defense counsel argued that the questioning on redirect about her fear of missing curfew had opened the door to the defense theory that she was afraid of her probation being revoked and had lied as a result of that fear. Counsel represented that there was at the time of the incident a pending petition to revoke her probation, which included allegations of D.Y. disobeying her mother's rules and missing curfew on prior occasions. The State responded that the petition referred to by defense counsel bore a file-stamp of September 20, 2018, which was one day before the events at issue. The State argued that this called into question whether D.Y. would have had notice of a petition filed one day earlier. The trial court stated that it stood by its prior ruling. It found no evidence that D.Y. had notice of a petition filed one day earlier so as to have a motive to fabricate. The trial court further reiterated that it did not believe probation could be revoked based on her failure to follow curfew rules imposed by her mother.

¶ 26    Re-cross examination then proceeded, and D.Y. stated that she did not recall slapping Josh. She tried to scratch him, but she did not cut him. She does not remember telling a nurse that she did in fact scratch and cut Josh's hands. She testified that today had been the first time anyone had ever asked her why she did not attempt to run out of the room. She testified that nothing stopped her from running or screaming when she finally left the motel room on Saturday. She testified that she felt safe with Kywon present, even though he forced her to take a shower and refused to take her with him when she had asked the night before.

¶ 27    After the conclusion of D.Y.'s testimony, the defense made an offer of proof concerning her probationary status at the time of the incident. Records from Lake County, Indiana, showed that D.Y. had been arrested there on February 28, 2018, and charged with Class A misdemeanor

criminal trespass. Following an initial hearing, she was detained. A probation report dated March 8, 2018, stated that D.Y.'s mother indicated that D.Y. did not always obey her rules and that D.Y.'s whereabouts had been unknown when she was arrested. She was released to in-house arrest on March 15, 2018, and ordered to remain in her home except when accompanied by a parent. A plea agreement was entered on May 10, 2018, in which D.Y. was adjudicated for the Class B misdemeanor charge of unauthorized entry to a motor vehicle. She was sentenced to six months probation, 24 hours of community service, and in-home based services. On August 1, 2018, a verified petition for contempt and rule to show cause was filed by the probation department, stating that D.Y. had not made herself available for services and had missed probation meetings. The petition was served on D.Y.'s mother on August 8, 2018. A contempt hearing was scheduled for September 27, 2018, and the hearing order was served on D.Y.'s mother by certified mail. The trial court made no further statements or rulings on the matter following the offer of proof.

¶ 28    The State's second witness at trial was Comea Sykes. She testified that she is D.Y.'s mother. On the night at issue, D.Y. left home wearing a blue jean jacket, a light blue one-piece body suit, and army fatigue pants. She did not return home that night, and Sykes did not hear from D.Y. until the following morning at 11 a.m., when she received a call from an unknown number with a 312 area code. Sykes heard D.Y. crying and recognized her voice. She asked D.Y. where she was, received no response, and the call ended. Sykes called the number back three or four times with no answer. She went to the East Chicago police station and filed a missing person's report.

¶ 29    Around 8 p.m. that evening, D.Y. returned home. Sykes was not home at the time but immediately went there. She stated that D.Y. was crying and appeared "lifeless," with "no energy, very faint looking." She had bruises on her neck, was pale, and had puffy eyes and a scratch on the back of her neck. She was wearing a black pair of men's boxers and a pink bra. D.Y. told her

what had happened, and Sykes called an ambulance. The paramedics took D.Y. to St. Catherine's Hospital, which is about two blocks from their home. Later, D.Y. showed Sykes the Facebook pages of the people involved, and Sykes gave those to the police.

¶ 30     On cross-examination, Sykes agreed that she had given a recorded statement in which she stated that she heard something "like a moan" in the background of the phone call. She also agreed that she had told D.Y. on the day at issue that she had a curfew of 10 p.m. and to be back by curfew. She stated that she would not have been angry if D.Y. had gotten home later, as long as they had communication throughout the day with her. However, she would be mad if D.Y. left the house at 8 p.m. and was out all night with no communication, and D.Y. would know that her mom would be angry about that.

¶ 31     The State's third witness was Detective Marty Dosen of the Lansing Police Department, who testified that he was assigned to investigate this case on September 24, 2018. He began his investigation by obtaining the sexual assault kit from St. Catherine's Hospital and sent it to the forensic lab for analysis. He next spoke to Sykes, who provided him with a Facebook profile page with photographs. Using two photographs from that Facebook page, he issued a "Critical Reach Bulletin" to other area law enforcement agencies to identify the individual in the photographs. He received a response to his bulletin from a police officer in Harvey, Illinois, and based on that response he was able to identify the individual. Detective Dosen made an in-court identification of defendant as the individual shown in the photographs.

¶ 32     Detective Dosen next obtained surveillance video from the United Motel in Lansing, from September 21, 2018, to September 22, 2018. He and another detective reviewed footage from about 60 to 80 cameras, and he downloaded the footage that he thought he needed. Detective Dosen identified certain surveillance footage showing defendant carrying a garbage bag and disposing of

it in a dumpster at 2:07 p.m. on September 22, 2018, which was published for the jury. He testified that the dumpster had been emptied by the time he obtained the video. He also obtained the rental paperwork for room 204 of the motel and learned that Christopher Campbell, whom he learned that D.Y. knew by the nickname "Kywon," had rented the room. He did not investigate inside the room because other people had stayed in it since then.

¶ 33 He next arranged for D.Y. to undergo a forensic interview at La Rabida. This occurred on October 3, 2018, and Detective Dosen observed the interview through a two-way mirror. As part of that interview, he asked Sergeant Justin Rimovsky of the Park Forest Police Department to serve as the independent administrator of a photo array. The photo array was created by his partner Detective Curtis, and a photo of defendant was included in it. He observed D.Y. identify the photo of defendant. Thereafter, he attempted to locate defendant but was unable to do so, and he obtained a warrant for his arrest. He testified that the FBI fugitive task force assisted in locating defendant. He also obtained records from Facebook for defendant and Christopher Campbell through a search warrant. He observed defendant taken into custody at a McDonald's restaurant in June 2019, and thereafter he obtained a DNA sample from defendant. He also learned that defendant's date of birth was in 1990.

¶ 34 The State's fourth witness was Sergeant Rimovsky. He testified that he acted as independent administrator of the photo array to D.Y. on October 3, 2018. There were six photographs in the array viewed by D.Y., and she identified the fourth photo as the person who forced her to perform oral sex after choking her. Sergeant Rimvosky made an in-court identification of defendant as the person shown in the photo selected by D.Y.

¶ 35 The State next presented four stipulations. In the first, the parties stipulated to the testimony of David Kincaid, a manager for the United Motel in Lansing. His testimony would be that the

motel is a two-story building with access to the rooms from exterior hallways. On September 21, 2018, at 6:20 p.m., Christopher Campbell checked into room 204, reserving seven nights for one guest and paying cash. Kinkaid would identify the receipt for check-in signed by Campbell and a copy of his identification card. He would also testify that the surveillance system was operating properly when Detective Dosen viewed and downloaded it.

¶ 36    In the second stipulation, the parties stipulated that Officer Talavera-Little of the Lansing Police Department would testify that defendant provided him with his phone number. In the third, the parties stipulated to the testimony of William Anselme, a forensic scientist with the Illinois State Police. He received and preserved the sexual assault kit containing fingernail scrapings collected from D.Y. and the swab of the right side of her neck, as well as the buccal swab standard from defendant. In the fourth, the parties stipulated to the testimony of Kelly Krejnik, also a forensic scientist with the Illinois State Forensic Science Command. She would testify that DNA analysis conducted on the samples taken would show no male DNA taken from the right-hand fingernail scraping; that partial male DNA was identified in the left-hand fingernail scraping, but defendant was excluded as the donor of that DNA profile; and that a low-level mixture of DNA profiles was identified from the sample taken from the right side of D.Y.'s neck that was interpreted as a mix of at least two people, with a major female profile and minor parts of the mixture that were incomplete and unsuitable for comparison.

¶ 37    The State's fifth witness to testify was Leslie Leyden, a registered nurse at St. Catherine's Hospital. She testified that she conducted a sexual assault examination kit on D.Y. in the early hours of September 23, 2018. D.Y. had been seen by two other nurses and a doctor prior to this. She testified that when she met with D.Y., she was complaining of neck pain and a sore throat and stated that she previously passed out or lost consciousness. D.Y. requested a pelvic examination

also. Upon examination, Leyden observed a scratch on the side of her neck about one inch in length. She used a black-light lamp to examine for fluids, and the only spot that fluoresced was one at the back of her neck at the hairline. Leyden took swabs from that area of her neck and fingernail scrapings from both hands.

¶ 38 On cross-examination, Leyden agreed that she wrote in quotation marks that D.Y. said, " 'I walked out of the motel and walked to the furniture store, called my friend, Rayshawn Johnson to come get me.' " She agreed that D.Y. had told her that Rayshawn picked her up and took her to his house to shower and collect herself, as she was still feeling faint; that she did not tell Rayshawn anything about what had happened to her; and that Rayshawn had taken her home at 8 p.m. on Saturday. Leyden also agreed that D.Y. had told her that she had scratched the perpetrator's hands and knew she had cut his hand. She agreed that the area that fluoresced on the back of D.Y.'s neck was not an injury; it could have been human bodily fluid, or it could have been something like lotion. She also agreed that her narrative report refers only to a "possible scratch" on the left side of D.Y.'s neck. She did not photograph the injury because the hospital does not have a camera to do so. Other than D.Y.'s self-reported tenderness and the possible scratch, Leyden noticed no other injuries to the neck, head, inside of mouth, or throat.

¶ 39 The State next presented an additional stipulation that the Cook County Department of Corrections had recorded a phone call between the defendant and a woman not identified. An excerpt of the audio from this phone call, approximately ten seconds in duration, was admitted into evidence and played for the jury. In it, the woman says, "Who is … this b****? Who the f*** is she?" Defendant responds, "Some girl that … somebody that I slept/slid with … with Chris one day." (The parties dispute whether defendant said "slept" or "slid" in this exchange.)

¶ 40 The State's final witness was Dustin Gourley, a special agent with the Federal Bureau of

Investigation (FBI) assigned to the violent crime fugitive task force. Special Agent Gourley testified that as of June 13, 2019, he was searching for defendant on an outstanding arrest warrant and learned that defendant was at a certain McDonald's restaurant in East Chicago. He identified defendant in court as the individual he was attempting to and did apprehend that day. He testified that there were 12 members of the task force who relocated to the McDonalds. One officer in plain clothes entered the lobby and communicated that he had made a positive identification of defendant. The remaining task force members then entered the McDonalds, approached defendant, removed his hood, and attempted to effectuate the arrest. Defendant then stood up in the booth and attempted to flee. He also made statements to the effect of " 'Shoot me, you're going to have to shoot me.' " Special Agent Gourley described defendant as actively resisting, punching and kicking officers, and attempting to conceal his hands to prevent the placement of handcuffs on him. Defendant was eventually placed in handcuffs and taken to a police station.

¶ 41    On cross-examination, Special Agent Gourley testified that at least 12 members of the task force entered the McDonalds that day. They were wearing plain clothes with vests that said "police." He did not recall whether guns were drawn during the arrest. Following the conclusion of testimony by Special Agent Gourley, the defense moved for a mistrial, arguing that his testimony was unduly prejudicial. The trial court denied the motion for mistrial, stating that it stood by its previous ruling on admissibility of the facts of arrest.

¶ 42    The State rested its case-in-chief, and the trial court denied a motion by defendant for directed finding. The defense then proceeded with its case-in-chief by presenting three stipulations. First, the parties stipulated to the testimony of Jodi Young, an emergency medical technician/paramedic who responded to D.Y.'s home at approximately 8:34 p.m. on September 22, 2018. When she arrived, D.Y. was in her room getting dressed. She appeared to be emotionally in distress but was

cooperative, alert, and oriented. She showed no signs of difficulty breathing. She reported that an older male had ripped her clothes off and used them to choke her. She did not know the names of the individuals involved. D.Y. reported that she retrieved her phone and called her friend to pick her up and that when the man was not looking, she ran out. D.Y. reported that her friend dropped her off at her apartment. She reported that she had pain in her throat and that it was painful to swallow. She appeared to be in shock. She was transported to St. Catherine's Hospital and arrived at 8:50 p.m.

¶ 43    Second, the parties stipulated to the testimony of Chona Carbonell, a registered emergency room nurse at St. Catherine's Hospital who spoke with D.Y. at approximately 9:22 p.m. on September 22, 2018. D.Y. stated to her that she went with a male friend around 8 p.m. and was supposed to watch a movie, but she was taken instead to a motel in Illinois. She stated that there was an older man in the motel with D.Y.'s friend. She did not report the names of the individuals involved. She reported that she was able to call another friend, who picked her up, and that she went to that friend's house. She said that she took a shower there and that around 8 p.m. tonight was dropped off at her house. She complained of neck pain from the choking. No respiratory distress was reported.

¶ 44    Finally, the parties stipulated that if Detective Dosen was recalled, he would identify certain individuals at various points in the motel surveillance video. On September 21, 2018, at 9:35 p.m., Christopher (Kywon) Campbell and D.Y. are shown walking down a motel hallway into a room holding plastic bags. At 9:37 p.m., defendant walks down the same hallway and enters the same room. On September 22, 2018, at 2:21 a.m., Kywon is shown leaving the motel room. At 7:20 a.m., Kywon is shown returning to the room, standing outside it, knocking on the door and window, and leaving within one minute.

¶ 45 The defense then rested its case-in-chief. Upon request by the prosecutor for clarification, the trial court reiterated its ruling that evidence of the facts of arrest could not be used to argue consciousness of guilt.

¶ 46 An off-the-record jury instruction conference then occurred, and the details of the parties' arguments and court's rulings were put into the record the following morning. Two jury instructions proposed by the defendant in a written motion are pertinent to this appeal. The first was a proposed nonpattern jury instruction that stated as follows:

> "You have received some evidence that [D.Y.] was 16 years old on September 22, 2018. Her age may only be considered by you for the limited purpose of considering the believability of [D.Y.]"

The second was referred to as a modified version of Illinois Pattern Jury Instruction, Criminal, No. 3.14 (approved Oct. 17, 2014) (IPI Criminal No. 3.14). Defendant's proposed instruction stated:

> "Evidence has been received that the defendant may have punched and kicked officers, as well as disobeyed commands, while being arrested.
>
> This evidence may not be considered by you in any way in determining the guilt of the defendant.
>
> It is for you to determine whether the defendant did in fact kick, punch, and disobey officers during his arrest. No weight should be given to that evidence in determining defendant's guilt."

In light of the above proposed instructions, defendant also objected to the trial court's omission of optional paragraph 7 from Illinois Pattern Jury Instruction, Criminal, No. 1.01 (approved Apr. 30, 2019) (IPI Criminal No. 1.01), which states, "Any evidence that was received for a limited purpose should not be considered by you for any other purpose."

¶ 47 The trial court overruled defendant's objection and gave IPI Criminal No. 1.01 without including optional paragraph 7. The trial court also refused defendant's proposed nonpattern instruction on age, reasoning that there was no allegation based upon the age of the parties. It also refused defendant's proposed instruction modifying IPI Criminal No. 3.14, reasoning that the other instructions given adequately addressed the law on this issue.

¶ 48 Following closing argument and jury instructions, the case was submitted to the jury. The jury found defendant guilty of aggravated criminal sexual assault and aggravated battery, and it found him not guilty of aggravated kidnapping. Defendant filed a timely motion for new trial. He thereafter filed an amended motion, styled as a motion for judgment notwithstanding the verdict or for a new trial. The trial court denied defendant's motion.

¶ 49 At sentencing, the trial court heard arguments in aggravation and mitigation, reviewed the presentence investigation report, and heard defendant's statement in allocution. The parties disagreed about whether defendant's two convictions should merge under one-act-one-crime principles, with defendant arguing that the act of strangulation underlying the aggravated battery conviction was the same act that satisfied the "force or threat of force" element of the aggravated criminal sexual assault conviction. The trial court ruled that the sentences on the two convictions should run consecutively, finding that enough evidence had been presented of "force or threat of force" beyond only strangulation to satisfy that element of aggravated criminal sexual assault. The trial court then sentenced defendant to 17 years for the aggravated criminal sexual assault conviction and a consecutive 4 years for the aggravated battery conviction. Defendant filed a motion to reconsider sentence, which the trial court denied. This appeal followed.

¶ 50 II. ANALYSIS

¶ 51 A. Sufficiency of the Evidence

¶ 52    On appeal, defendant first challenges the sufficiency of the evidence used to convict him on the charges of aggravated criminal sexual assault and aggravated battery. He argues that, because the testimony of D.Y. was inconsistent as to key events, contradicted by objective evidence and the testimony of other witnesses, and implausible in light of her motive to fabricate, the State failed to prove beyond a reasonable doubt that defendant strangled her or forced her to perform oral sex. For the reasons set forth below, we reject defendant's argument.

¶ 53    A reviewing court, faced with a challenge to the sufficiency of evidence, must determine " ' "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' " (Emphasis in original.) *People v. Grayer*, 2023 IL 128871, ¶ 27 (quoting *People v. Cunningham*, 212 Ill. 2d 274, 278 (2004), quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Under this standard, it is not the role of the reviewing court to retry the defendant. *People v. Gray*, 2017 IL 120958, ¶ 35. Rather, it is the trier of fact that has the responsibility of determining the credibility of witnesses, deciding what weight to give to their testimony, resolving conflicts in the evidence, and drawing reasonable inferences from the trial evidence. *People v. Swenson*, 2020 IL 124688, ¶ 36. Thus, a reviewing court will not substitute its judgment for that of the trier of fact on questions involving the weight of evidence or the credibility of witnesses. *Gray*, 2017 IL 120958, ¶ 35.

¶ 54    We will not reverse a conviction simply because evidence is contradictory or because the defendant claims a witness was not credible. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). Where contradictions or flaws are shown to exist as to part of the testimony of a witness, it is the role of the factfinder to judge how those contradictions or flaws affect the credibility of the whole of his or her testimony. *Cunningham*, 212 Ill. 2d at 283; accord *People v. Macklin*, 2019 IL App (1st) 161165, ¶ 17. That said, while a factfinder's determination of witness credibility is entitled

to great deference, its decision to accept testimony is neither conclusive nor binding on a reviewing court. *Gray*, 2017 IL 120958, ¶ 35 (citing *Cunningham*, 212 Ill. 2d at 280). Its acceptance of testimony must be reasonable, and in some cases the reviewing court may find, "after considering the whole record, that flaws in testimony made it impossible for any fact finder reasonably to accept any part of it." *Cunningham*, 212 Ill. 2d at 283. A conviction will be reversed where the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt as to the defendant's guilt. *People v. Murray*, 2019 IL 123289, ¶ 19.

¶ 55    In this case, defendant was convicted of aggravated criminal sexual assault, requiring proof that defendant committed an act of sexual penetration (*i.e.*, contact between his penis and D.Y's mouth) by use of force or threat of force, and that during the offense he acted in a manner that threatened or endangered the life of the victim. 720 ILCS 5/11-1.20(a)(1), 11-1.30(a)(3) (West 2018). He was also convicted of aggravated battery, requiring proof that he knowingly without legal justification caused bodily harm to or made physical contact of an insulting or provoking nature with D.Y., and that he did so by strangling her. *Id.* §§ 12-3(a), 12-3.05(a)(5). "Strangle" is defined as intentionally impeding the normal breathing or circulation of the blood of an individual by applying pressure on the throat or neck of that individual or by blocking the nose or mouth of that individual. *Id.* § 12-3.05(i).

¶ 56    On appeal, defendant does not challenge any specific element of either offense for which he asserts that proof was lacking. Rather, as indicated above, his argument is that the testimony of D.Y., which formed the foundation of the State's case, was so inconsistent, implausible, and contracted on key points that, considering her motive to fabricate an excuse for her behavior, it cannot be said to establish beyond a reasonable doubt that defendant strangled D.Y. or forced her to perform oral sex. Defendant's argument has four aspects, and we summarize these as follows.

¶ 57    First, defendant cites to various internal inconsistencies in D.Y.'s trial testimony and to discrepancies between her testimony at trial and the statements she gave to medical personnel on the night following the incident. While defendant identifies many examples, some of the more significant include the stipulated testimony of nurse Carbonell that D.Y. told her she was picked up from home by one man and that an older man was present at the motel when she arrived, whereas her trial testimony was that Josh was in the car with Kywon when he picked her up. Similarly, the stipulated testimony of paramedic Young was that D.Y. reported that an older male had ripped her clothes off and used them to choke her, whereas D.Y.'s trial testimony was that she did not recall how her clothes came off and that Josh did not use them to choke her. Defendant also points out that the evidence showed three stories by D.Y. about what happened after the events ended: (1) paramedic Young's testimony that she reported retrieving her phone and calling a friend to pick her up, running out of the motel room when the man was not looking, and being dropped at her apartment by her friend, (2) nurse Carbonell's testimony that she reported calling another friend who picked her up, going to that friend's house and taking a shower there, and being dropped off around 8 p.m., and (3) nurse Leyden's testimony that she walked out of the motel room after the men let her leave, went to a furniture store and called Rayshawn Johnson, went to his house to shower, and stayed there until 8 p.m. Defendant points out that all of these stories contradict her trial testimony that Kywon and Josh drove her home that day. Defendant also contends that it was never explained at trial why D.Y. did not arrive home until 8 p.m. when she testified that Kywon stopped only at a gas station and a corner store after leaving the motel in the afternoon.

¶ 58    Second, defendant cites various examples in which D.Y.'s trial testimony and her statements to medical personnel were inconsistent with the motel's surveillance video. He argues that D.Y.'s behavior when walking to the motel room strongly suggests that she went there with Kywon and

defendant for the purpose of staying there and partying, as opposed to making a brief stop before continuing to a movie theater. Defendant also contends that D.Y.'s testimony that Kywon left the motel room 20 minutes after they arrived is contradicted by the video showing that he did not leave until 2:21 a.m., and her testimony that she never fell asleep that night is undermined by video showing Kywon knocking on the door and window at 7:21 a.m.

¶ 59     Third, defendant contends that D.Y.'s account of an hours-long violent assault that included defendant strangling her to the point of unconsciousness and defecation, along with punching and slapping her in forcing sexual penetration, is not borne out by the medical evidence at trial. Defendant cites nurse Leyden's testimony that her examination of D.Y.'s body revealed only a "possible" scratch on her neck and that her black-light examination showed only a single spot on her neck that may have been something other than bodily fluids. No bruising, swelling, lacerations, or other abrasions were identified. Defendant also cites the evidence that his DNA was not found in the swabs of D.Y.'s fingernails.

¶ 60     Finally, defendant contends that the evidence suggests that D.Y. had a strong motive to fabricate a story of assault that night. He points out that D.Y. was then 16 years old and left home without telling her mother where she was going or with whom. Her intent was to smoke marijuana, and she in fact did so. Despite having a 10 p.m. curfew, she left shortly before that time, told Kywon that she could leave the state of Indiana, and then stayed out all night into the next evening, worrying her mother. Defendant further suggests that it could be reasonably inferred from the evidence that male DNA was found under her fingernails (of which defendant was excluded as the donor) that she possibly engaged in sexual activity with somebody else, particularly as no satisfactory explanation was ever given for why she did not arrive home until 8 p.m. after leaving the motel in the afternoon with Kywon and Josh. Defendant contends that in totality, the significant

credibility problems in D.Y.'s testimony warrant reversal of his convictions on both counts.

¶ 61    We reject defendant's argument that the evidence was insufficient to convict him. Although we recognize that certain inconsistencies were exposed in D.Y.'s account of the events on the day at issue, defendant greatly overstates the extent to which her testimony was inconsistent or uncorroborated as to the material elements of the offenses at issue. As stated above, it is for the factfinder to judge how contradictions or flaws in part of a witness' testimony affect the credibility of the whole of his or her testimony. *Cunningham*, 212 Ill. 2d at 283. Many of the inconsistencies cited by the defendant involve matters that are collateral to the material elements of the offenses, involving her account of events either prior to arriving at the motel room or after leaving it. Where inconsistencies in testimony relate to collateral matters, they need not render the testimony of the witness as to material questions incredible or improbable. *Gray*, 2017 IL 120958, ¶ 47.

¶ 62    As to the material elements of aggravated criminal sexual assault and aggravated battery, D.Y. provided an account at trial that while she was alone overnight in the motel room with defendant, he repeatedly used various forms of force and threats of force to cause her to perform oral sex on him. This included strangling her by choking her neck with his hands so intensely that she felt very weak, was unable to speak or breathe, and involuntarily defecated in her clothing. She also testified that defendant was "strong-arming me to lay down" by using "all his force to keep me down on the bed" while he was "hovering over me." She described being on the floor between the beds with him standing over her and "punching me, slapping me." Further evidence was presented that she reported to the forensic interviewer within two weeks of the incident that she had passed out from defendant choking her, that defendant had told her to perform oral sex until he told her to stop, that he had his hand on her neck while making her do it, and that he would punch her if she did not do it right.

¶ 63       As to the above points, her testimony was corroborated by consistent complaints of neck and throat pain due to strangulation following the incident. First, D.Y's mother described that when she arrived home that evening she was crying, had bruises and scratches on her neck, and looked pale, lifeless, and faint. Paramedic Young's testimony was that D.Y. reported having been choked and complained of pain in her throat and difficulty swallowing. Nurse Carbonell's testimony included her reporting neck pain from being choked. And Nurse Leyden's testimony included D.Y.'s reporting of neck pain and a sore throat, along with observation of a one-inch scratch (described as a "possible" scratch) on the side of her neck and an area of fluid on the back of her neck that fluoresced under a black light. Furthermore, the jury viewed surveillance video showing D.Y. continually holding the front of her neck with her hand as she exited the motel with Kywon.

¶ 64       We further find D.Y.'s testimony as to the severity of the assault to be corroborated by the motel surveillance video. That video showed D.Y. arriving at the motel room wearing a light-colored one-piece bodysuit with long pants. Her testimony was that Josh began choking her neck at a time when her clothes were still on, and she involuntarily defecated in her clothes as a result of him choking her. She testified that her clothes then came off because she "had messed them up." She testified that the following afternoon, someone put her clothes into a plastic bag and that Kywon gave her a pair of men's underwear and some basketball shorts to put on. The surveillance video of her leaving the motel that afternoon shows her wearing dark shorts and a large button-up shirt. It also shows Kywon coming to the room with what appear to be plastic garbage bags, followed several minutes later by defendant walking to the motel dumpster carrying a plastic garbage bag and throwing it away. Additionally, D.Y.'s mother's testimony was that D.Y. came home wearing men's boxer shorts and a pink bra.

¶ 65       Another point of evidence that the jury reasonably could have found to bolster the credibility

of D.Y. as to the material elements of the offenses was that, on the day following this incident, defendant sent D.Y. a message through Facebook for the first time ever. In that message, he acknowledged that "I know you probably hate me" but sought her reassurance to "just let me know you cool." This Facebook message undermines the argument that D.Y. consensually stayed out all night partying and then fabricated a story so she would not get in trouble with her mother for coming home long after curfew.

¶ 66        In conclusion, the evidence at trial was sufficient to establish defendant's guilt beyond a reasonable doubt. While there were inconsistences in D.Y.'s testimony, defendant greatly overstates the extent to which her testimony was inconsistent or uncorroborated as to the material elements of the offenses charged. Issues of D.Y.'s credibility and the effect of any inconsistencies on her overall believability of her testimony were for the jury to determine, and we conclude that the evidence was fully sufficient for a reasonable jury to find the essential elements of aggravated criminal sexual assault and aggravated battery proven beyond a reasonable doubt.

¶ 67                                    B. D.Y.'s Probation

¶ 68        Defendant's second argument on appeal is that his constitutional right to present a defense was violated when the trial court precluded him from cross-examining D.Y. about the fact that, at the time of the incident at issue, she was on probation for juvenile delinquency, that her conduct that night violated certain rules of her probation, and that she was already facing a petition to revoke her probation. Defendant emphasizes that D.Y.'s credibility was of central importance to the case, and he contends that he was denied the opportunity to fully explore and expose the effect that her probationary status had on her motive to fabricate a story about the reason she stayed out all night with Kywon and defendant.

¶ 69        A criminal defendant is constitutionally guaranteed a meaningful opportunity to present a

complete defense. *People v. Johnson*, 2018 IL App (1st) 140725, ¶ 58 (citing *Holmes v. South Carolina*, 547 U.S. 319, 331 (2006)). "Although the United States Constitution prohibits the exclusion of defense evidence under rules 'that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote,' well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by other factors, such as unfair prejudice, confusion of the issues, or potential to mislead the jury." *Id.* (quoting *Holmes*, 547 U.S. at 326). As defendant here recognizes, a claim involving denial of the constitutional right to present a complete defense due to improper evidentiary rulings is reviewed for abuse of discretion. *People v. Williams*, 2020 IL App (1st) 162512, ¶¶ 73-74 (citing *People v. Burgess*, 2015 IL App (1st) 130657, ¶ 133). A reviewing court will find abuse of discretion only where a trial court ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the court. *People v. Patrick*, 233 Ill. 2d 62, 68 (2009).

¶ 70      In summary, defense counsel argued at three points of trial that the defense should be allowed in cross-examination of D.Y. to elicit the fact that she was on probation for a misdemeanor adjudication of juvenile delinquency at the time of the events. See *supra* ¶¶ 6, 25, 27. Counsel's argument referenced that D.Y.'s mother had made prior complaints to the probation officer that D.Y was disobeying her mother's rules, and this had caused probation to admonish D.Y. to follow those rules, one being a 10 p.m. curfew. Counsel also referenced a petition to revoke probation that was on file as of the time of the events at issue, and he represented that it included an allegation that D.Y. had disobeyed her mother's rules and missed curfew on prior occasions. Counsel argued that D.Y.'s knowledge of the above facts made her afraid that staying out long after her curfew on this occasion would cause her mother to complain to probation again, that she would get in trouble with probation, and that her probation would be revoked; accordingly, this fear provided her with

a motive to fabricate a story about the reason she had stayed out nearly a whole day past her curfew.

¶ 71     The trial court ruled that defendant could not cross-examine D.Y. as to her probationary status for several reasons. First, it found that the requirement that she obey her mother's rules had no legal force and effect. The court reasoned that it was too much of a stretch to argue that D.Y. feared having her probation revoked if her mother told the probation officer that she had stayed out past curfew. Second, the court noted that the file-stamp on the petition to revoke probation was dated September 20, 2018, which was only one day prior to the events at issue. As such, the trial court found that D.Y. was unlikely to have had notice of it, so as to support an argument that she fabricated a story because she was worried about the outcome of this petition.

¶ 72     We hold that the trial court's ruling was not an abuse of discretion, and it did not deny defendant the opportunity to present a complete defense. Our review of the record shows that defense counsel ably and extensively cross-examined both D.Y. and her mother about the fact that D.Y. had a 10 p.m. curfew and that D.Y. knew her mother would be angry that she did not come home until 22 hours after curfew. The trial court's preclusion of defendant from also cross-examining D.Y. about this topic in the context of her probationary status was not unreasonable. Although the trial transcript suggests that the trial court may have reviewed documents concerning D.Y.'s probation status, it is not clear to us what, if anything, it reviewed. Only one probation document is included in the record on appeal, which is a two-page "probation plan" signed by D.Y. and her mother on May 10, 2018, attached as an exhibit to defendant's posttrial motion. The probation plan sets forth 18 rules and regulations that D.Y. was agreeing to follow, one of these being to "[o]bey all reasonable demands of your parents and obey the household rules." This document does not set forth consequences for D.Y.'s failure to comply with its rules or regulations.

¶ 73     We agree with the trial court's assessment that this kind of rule is more aspirational than

enforceable, and, as it is set forth in the probation plan, it is too vague to support the inference that D.Y. feared her probation would be revoked for failing to comply with her mother's curfew rules. Based on our review of this document, it appears that allowing inquiry into the rules of D.Y.'s probation plan or the consequences of disobeying them had the potential to inject a confusing collateral issue into the trial.[1] Accordingly, we find it well within the trial court's discretion to preclude this line of cross-examination by defendant.

¶ 74    As indicated above, the transcript suggests that the trial court reviewed a probation document with a file stamp of September 20, 2018, and after doing so concluded that D.Y. was unlikely to have notice of the petition to revoke probation by the time of the events at issue the following day. We find no such document in the record on appeal, nor is there a citation to the record in either party's briefs. Defendant's offer of proof was that a petition to revoke probation was filed on August 1, 2018, which stated that D.Y. had not made herself available for services and had missed probation meetings; this was served on D.Y.'s mother on August 8, 2018, and was set for hearing on September 27, 2018. This offer of proof provides us with no information about any purported allegations that D.Y.'s mother had complained on prior occasions about her missing curfew or that D.Y. knew she was at risk of having her probation revoked for this reason. The state of the record precludes any further consideration by this court of the contents of this petition. See *People v. Ortiz*, 2017 IL App (1st) 142559, ¶ 41 (an appellant has the burden of presenting a record sufficient to support its claim of error, and any insufficiencies arising from an incomplete record must be resolved against appellant). The trial court's ruling that D.Y. likely did not have notice of the

---

[1] In the trial court, the only probation rule argued by defense counsel involved D.Y.'s compliance with the curfew rules imposed by her mother. On appeal, defendant cites additional rules from this probation plan as relevant to motive: to obey all laws, not consume or possess alcohol or drugs, "[c]omply with all curfew laws," "[h]ave parental permission for any activities which required her to be away from home," and "[o]btain permission from her probation officer before leaving Lake County for any length of time."

petition to revoke probation filed one day earlier was reasonable and not an abuse of discretion.

¶ 75    We reject defendant's argument that this exact question is governed by *Davis v. Alaska*, 415 U.S. 308 (1974). In that case, a trial court relied on two Alaska state laws prohibiting the admissibility of juvenile records in court cases to enter a protective order barring the defendant, who was on trial for burglary, from inquiring on cross-examination into the fact that a key prosecution witness was also on probation for a juvenile delinquency adjudication for burglary. *Id.* at 310-11. It was shown that this ruling had the effect at trial of significantly hampering the defense's efforts to challenge the accuracy and truthfulness of the witness' testimony by demonstrating that the witness was susceptible to undue pressure because of his "vulnerable status as a probationer" and then arguing that this provided a basis for the jury to infer bias in his testimony favorable to the prosecution. It similarly prevented the defense from having a basis from which to argue that the witness had a motive to shift suspicion in the burglary away from himself by hastily misidentifying the defendant as the perpetrator. *Id.* at 312-18.

¶ 76    The supreme court stated that the right to cross-examine a witness includes the right to impeach that witness by revealing possible biases and ulterior motives the witness may have for testifying. *Id.* at 315-16. It held, on the facts before it, that defendant had been denied the right of "effective cross-examination" because, "[w]hile counsel was permitted to ask [the witness] whether he was biased, counsel was unable to make a record from which to argue why [the witness] might have been biased or otherwise lacked that degree of impartiality expected of a witness at trial." *Id.* at 318. This exposed the defendant to the jury possibly thinking that counsel was "engaged in a speculative and baseless line of attack on the credibility of an apparently blameless witness." *Id.* "[T]o make any such inquiry effective, defense counsel should have been permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could

appropriately draw inferences relating to the reliability of the witness." *Id.* The court concluded that this right of confrontation was paramount to the State's interest in protecting juvenile offenders by ensuring the confidentiality of their records. *Id.* at 319.

¶ 77    We do not interpret *Davis* as setting forth a narrow rule that a witness' juvenile record is always a proper area of cross-examination to elicit evidence of motive; rather, it stands for the broader proposition that a criminal defendant must be allowed "effective" cross-examination, meaning inquiry into the evidentiary basis bearing on bias or motive to testify. Our own supreme court has summarized the principle set forth in *Davis* as follows: "We think *Davis* established the rule that a trial court cannot bar defense counsel from exploring the subject of a crucial witness' potential bias on cross-examination, including the reason for that potential bias, even if this information is protected by a statutory privilege intended to protect the witness; such information is valuable in the jury's evaluation of the truthfulness of the witness' testimony." *People v. Bean*, 137 Ill. 2d 65, 96 (1990).

¶ 78    In this case, the trial court's preclusion of defense counsel from cross-examining D.Y. on the topic of her juvenile probation does not implicate the denial of "effective" cross-examination that existed in *Davis*. Here, defense counsel was able through cross-examination of D.Y. and her mother to establish a solid basis from which to argue that D.Y. had a motive to fabricate a story about why she was out all night with Kywon and Josh. Counsel's cross-examination left the jury well aware that D.Y. had engaged in a wide variety of behavior that night that would cause most 16-year-olds to fear angering their parents and getting in significant trouble: leaving home shortly before her 10 p.m. curfew and not returning until 22 hours later, failing to tell her mother where she was going or who she was leaving with, smoking marijuana, and going to a motel room in Illinois with two men after they had purchased liquor. The trial court reasoned, however, that it

was too much of "a stretch" to argue that D.Y. feared that her mother would tell her probation officer what she had done and that her probation would be revoked as a result. For all the reasons set forth above, the trial court's rulings on this matter were not an abuse of discretion.

¶ 79                                    C. Facts of Defendant's Arrest

¶ 80        Defendant's third argument on appeal is that the trial court abused its discretion in admitting evidence of the facts and circumstances of defendant's arrest on the present charges. Detective Dosen testified at trial that after D.Y. identified defendant in the photo array on October 3, 2018, he attempted to locate defendant but was unable to do so. He obtained an arrest warrant, and the FBI fugitive task force assisted the Lansing police in locating defendant. Special Agent Gourley of the FBI testified that he was part of that task force, which obtained information on June 13, 2019, that defendant was at a McDonalds restaurant in East Chicago. The task force, which consisted of 12 members, relocated to the perimeter of the McDonalds. One task force member in plain clothes went inside and communicated a positive identification of defendant. The other task force members then entered, approached defendant at a booth, and attempted to effectuate the arrest. He testified that defendant stood up, attempted to flee, and made a statement to the effect of "you're going to have to shoot me." Defendant then continued actively resisting arrest by stiffening his body, punching and kicking officers, and attempting to conceal his hands to avoid being handcuffed. He was then subdued and transported to a police station in East Chicago.

¶ 81        The above evidence was the subject of pretrial motions *in limine* by both parties. Defendant's motion sought to limit evidence of the arrest to its date, time, and location, arguing that additional facts showing that he resisted arrest were irrelevant and highly prejudicial. By contrast, the State sought to use it as evidence of flight probative of guilt. At the hearing on these motions, argument focused on whether defendant had knowledge that that he was being arrested that day on the

charges at issue in this case. It was shown that, in addition to the arrest warrant for the charges at issue, he was also the subject of a bond forfeiture warrant for failing to appear at a trial in Cook County on unrelated misdemeanor charges on September 26, 2018 (four days after the events at issue in this case) and again on November 2, 2018. Also, a warrant for violation of probation was issued out of Elkhart County, Indiana, on December 20, 2018. Accordingly, defense counsel argued that defendant likely believed he was being arrested based on one of these two warrants. The State argued that defendant's knowledge that he was suspected on criminal offenses arising out of the present incident was shown by the message he sent to D.Y. through Facebook Messenger on the day after the incident and by the fact that his failure to appear in court for trial on the unrelated misdemeanor case occurred only four days after this event.

¶ 82    The trial court ruled that it would allow the State to admit evidence of the facts and circumstances of defendant's arrest, on the basis that they were part of the facts of the case and thus relevant for that reason. However, the court also ruled that the State could not use it to argue consciousness of guilt as to the charges at issue because it was not sufficiently shown that defendant knew that he was a suspect on charges arising from this incident, citing to *People v. Wilcox*, 407 Ill. App. 3d 151, 169 (2010) ("Whether an inference of guilt may be drawn from evidence of flight depends on the defendant's knowledge that the crime has been committed and that he is or may be suspected to be the culprit."). Defendant later objected when this evidence was presented at trial and moved for a mistrial following the testimony of Special Agent Gourley.

¶ 83    Defendant now argues on appeal that the trial court erred in admitting evidence of the facts and circumstances of his arrest. Primarily, he takes issue with evidence of the involvement of the 12-member FBI fugitive task force (which was also referred to as the "violent crimes fugitive task force"), his statement that officers would have to shoot him, and his actions of resisting efforts to

arrest him. He argues that this evidence was not relevant for any permissible purpose in this case, as there were no unexplained facts about the course of the investigation that justified Special Agent Gourley's testimony into the FBI fugitive task force, defendant's statement, and his acts of resisting arrest. He argues this evidence served only to cast him in a negative light before the jury and to suggest a consciousness of guilt that was not sufficiently connected to the offenses for which he was on trial. He thus argues that the prejudice caused him by the admission of this evidence substantially outweighed any minimal relevance it may have had.

¶ 84        Evidentiary motions, such as motions *in limine*, are directed to the trial court's discretion. *Patrick*, 233 Ill. 2d at 68. It is within the trial court's discretion to decide whether evidence is relevant and admissible, and a decision by it to admit evidence will not be reversed absent a clear abuse of discretion resulting in manifest prejudice to the defendant. *People v. Hayes*, 139 Ill. 2d 89, 130 (1990); *People v. Lewis*, 2015 IL App (1st) 122411, ¶ 73. Evidence is considered relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of an action either more or less probable than it would be without that evidence. *People v. Morgan*, 197 Ill. 2d 404, 455-56 (2001). However, even when evidence is relevant, the trial court has the discretion to exclude it if its prejudicial effect substantially outweighs its probative value. *People v. Lewis*, 165 Ill. 2d 305, 329 (1995).

¶ 85        In our view, this was the kind of close evidentiary question that was within the trial court's discretion to resolve. The trial court was faced with opposing motions *in limine* on this issue, and both parties' arguments had a degree of merit. The trial court's ruling split the difference between the parties' positions on their motions *in limine* by allowing the State to elicit facts surrounding defendant's arrest on the charges at issue but prohibiting it from arguing consciousness of guilt. We cannot say that the trial court abused its discretion in its handling of this issue.

¶ 86    We agree in part with defendant's argument that evidence about the details of his arrest was not admissible solely because it involved the charges for which he was on trial, regardless of its relevance to any fact at issue or its prejudicial impact. "The facts and circumstances attending an arrest of an accused may be put into evidence *when they tend to connect defendant with the offense for which he is being tried.*" (Emphasis added.) *People v. Martin*, 121 Ill. App. 3d 196, 212 (1984) (citing *People v. Evans*, 25 Ill. 2d 194, 202 (1962)). However, we believe also that the trial court would have acted within its discretion to admit this evidence without limitation, particularly defendant's statement that the police would have to shoot him in conjunction with his conduct in resisting apprehension, as evidence probative of consciousness of guilt. See *People v. Hart*, 214 Ill. 2d 490, 519 (2005) ("defendant's flight and resistance upon apprehension constitute circumstances from which the trier of fact could infer consciousness of guilt"); *People v. Sustak*, 15 Ill. 2d 115, 123-24 (1958) (details of defendant's resistance of arrest are admissible as "indicative of and a measure of the consciousness of guilt"). The inference of guilt which may be drawn from such evidence depends upon the defendant's knowledge that an offense had been committed of which he may be suspected as the perpetrator. See *Lewis*, 165 Ill. 2d at 349. However, actual knowledge of a possible arrest is not necessary to render such evidence admissible where there is evidence from which such a fact may be inferred. *Id.* at 350. In this case, we tend to agree with the State that defendant's message to D.Y. through Facebook on the day after the incident, acknowledging that "I know you probably hate me" but seeking assurance to "let me know you cool," is circumstantial evidence from which a jury could infer that defendant knew a criminal offense had occurred that night of which he was suspect.

¶ 87    Thus, with this circumstantial evidence from which to infer knowledge, evidence of defendant's statement and conduct in resisting apprehension could have been admitted into

evidence as probative of consciousness of guilt of the charges at issue; the fact that defendant thought he was being arrested due to warrants in unrelated matters is evidence that could be brought out and argued by the defense, but such potential alternative explanations would go to the weight to be given the evidence by the trier of fact, not to its admissibility. *People v. Day*, 76 Ill. App. 3d 571, 586 (1979) (" 'ambiguities or explanations tending to rebut an inference of guilt do not render flight evidence inadmissible but, rather, must be introduced as part of the defense and submitted to the jury' " (quoting *People v. Yazum*, 196 N.E.2d 263, 265 (N.Y. 1963)); *Sustak*, 15 Ill. 2d at 124 ("It was proper to receive evidence of a separate crime in resisting arrest, and the burden falls on the defendant to show that he resisted because he did not wish to be arrested for some other reason"); *McKevitt v. People*, 208 Ill. 460, 469 (1904) ("If the person arrested was under the impression he was being arrested for some other offense than the one for which he is being tried, and resisted because he did not want to be apprehended for such other offense, or for any reason other than a desire to avoid a prosecution and trial for the offense for which he is being tried, the burden rests upon him to show that fact by cross-examination or otherwise"); see *People v. Carter*, 2016 IL App (3d) 140196, ¶ 38.

¶ 88        Given the above-cited authority, we reject defendant's assertion that a rule exists that "[o]nly where the record contains *no* evidence that defendant fled for any other reason is an inference of guilt permissible." (Emphasis in original.) Such a rule would allow more favorable treatment to defendants alleged to have committed multiple offenses than those charged with a single crime. The cases cited by defendant do not support the existence of such a rule. In *People v. Harris*, 23 Ill. 2d 270, 273 (1961), a defendant who had escaped jail and fled to Georgia later surrendered himself on charges of assault unrelated to the burglary at issue. It was not shown that the defendant knew he was suspected of burglary at the time he escaped and fled, and the court applied the rule

that the inference of guilt to be drawn from flight depends upon knowledge that a crime was committed of which the defendant may be suspected. *Id.* We see no mention of a rule as cited by defendant, nor do we believe the case supports the existence of such rule. The case of *People v. Delgado*, 30 Ill. App. 3d 890, 896 (1975), was merely one in which no alternative explanation for flight was offered by the defendant. The court thus stated, "Where the record contains no evidence to show that defendant fled for any reason other than consciousness of guilt, as in the instant case, such evidence of flight is admissible." *Id.* It made no statement that such evidence would be inadmissible if defendant asserted he fled for a different reason.

¶ 89     We undertake the above analysis to demonstrate that, contrary to defendant's argument, the trial court was faced with faced with a meritorious motion *in limine* by the State to admit evidence of the details of defendant's arrest as probative of consciousness of guilt on the charges at issue. That said, we also find that the defendant presented a meritorious argument in his motion *in limine* that the risk of unfair prejudice from the jury hearing evidence that his arrest involved a 12-member FBI violent crimes task force and that he physically resisted apprehension while stating that police would have to shoot him substantially outweighed its probative value. See *Lewis*, 165 Ill. 2d at 329; Ill. R. Evid. 403 (eff. Jan. 1, 2011). This is particularly true given that the arrest occurred nine months after the incident, nothing about these details of the arrest directly link defendant to the charges at issue, explanations other than the charges at issue exist that potentially explain his conduct, and evidence showing his knowledge that he might be a suspect of criminal defenses involving D.Y. is only circumstantial. Accordingly, we also believe the trial court would have acted within its discretion to exclude this evidence in its entirety on this basis.

Faced with meritorious arguments on this issue by both sides, we hold that the trial court did not abuse its discretion by splitting the difference and admitting evidence involving the details of

defendant's arrest but precluding the State from arguing consciousness of guilt. The defendant clearly received a partial benefit from this ruling, in that he avoided being put in the position of introducing evidence of other warrants or reasons to explain his conduct. He also avoided the jury hearing argument by the State about consciousness of guilt and having to rebut such argument, thereby relegating this evidence to a minor point in the overall case.

¶ 90    However, even if there was error in the trial court's admission of the details of defendant's arrest, we find that it was harmless beyond a reasonable doubt. For purposes of harmless-error analysis, we accept defendant's characterization of his resisting arrest as "other crimes" evidence. "Erroneous admission of other-crimes evidence calls for reversal if the evidence was 'a material factor in the defendant's conviction such that, without the evidence, the verdict likely would have been different.' " *People v. Adkins*, 239 Ill. 2d 1, 23 (2010) (quoting *People v. Hall*, 194 Ill. 2d 305, 339 (2000)). "If it is unlikely that the error influenced the jury, reversal is not warranted." *Hall*, 194 Ill. 2d at 339 (citing *People v. Cortes*, 181 Ill. 2d 249, 285 (1998)).

¶ 91    Reviewing the evidence of the details of defendant's arrest in light of the trial evidence as a whole, we find no basis to conclude that the evidence into defendant's arrest was a material factor in his conviction such that the verdict likely would have been different without that evidence. Despite defendant's protestations about the negative light in which this evidence cast him, the evidence into the details of his arrest was minimal. Testimony on the matter was elicited in a factual way, with nothing done to emphasize this evidence. In closing argument, the prosecutor made one brief reference to defendant's statement only, but he did not add any argument as to its significance or inferences to be drawn from it. He stated:

> "We know on June 19th, 2019 we heard from Special Agent Gourley from the FBI
>
> that this defendant was in the McDonald's. They had finally located him. They went in to

arrest him. He attempted to get up from the booth and at that point stated, 'you are gonna have to shoot me. You are gonna have to shoot me.' "

¶ 92    In contrast to the minimal nature of the evidence of the details of the arrest, the jury was presented with substantial evidence of defendant's guilt on the charges of aggravated criminal sexual assault and aggravated battery. The jury viewed surveillance video showing defendant entering a motel room with D.Y. at 9:37 p.m. on September 21, 2018, and remaining there with her until 2:32 p.m. the following afternoon. They were alone there together for most of the last 12 hours. D.Y. provided extensive testimony that defendant repeatedly used various forms of force and threats of force throughout that time to cause her to perform oral sex on him. The most significant act of force to which she testified was that he strangled her neck with his hands to the point where she felt weak, was unable to speak or breathe, and involuntarily defecated in her clothing. There was also evidence she reported passing out from the strangulation. Again, there is video evidence that corroborates this testimony. First, she is shown holding the front of her neck with her hand during the entire time she is walking out of the room to Kywon's car. Second, she testified that her clothes were removed and later thrown away after she defecated in them as a result of being strangled. The surveillance video shows Kywon coming to the motel room in the afternoon carrying what appear to be plastic trash bags, followed shortly thereafter by defendant walking to the motel dumpster to dispose of a plastic bag. D.Y. is then seen leaving the room wearing dark shorts and a large button-up shirt, which is different than the one-piece bodysuit with long pants in which she is shown arriving. D.Y.'s testimony is further corroborated by her consistent reports of neck and throat pain from strangulation to all of the medical professionals to whom she spoke following the incident. She was also shown to have a possible scratch on her neck and spot near the hairline of her neck that fluoresced under a black light. Finally, the defense of

consent was undermined by evidence that defendant sent D.Y. a message the following day stating "I know you probably hate me" but seeking her reassurance to "just let me know you cool."

¶ 93    Despite defendant's urging that the inconsistencies in parts of D.Y.'s testimony undermined her overall credibility and that she had a motive to lie, we conclude that the evidence of his guilt is overwhelming as to the offenses charged. Given the extensive evidence of defendant's guilt, we find no reasonable likelihood that the jury's verdict was influenced by admission of evidence involving the details of his arrest.

¶ 94    Defendant argues in the alternative that, if evidence into the facts and circumstances of his arrest was admissible, the trial court erred by failing to instruct the jury with his proposed limiting instruction. At the conclusion of evidence, defense counsel tendered what he referred to as a modified version of IPI Criminal No. 3.14, which stated:

> "Evidence has been received that the defendant may have punched and kicked officers, as well as disobeyed commands, while being arrested.
>
> This evidence may not be considered by you in any way in determining the guilt of the defendant.
>
> It is for you to determine whether the defendant did in fact kick, punch, and disobey officers during his arrest. No weight should be given to that evidence in determining defendant's guilt."

The trial court refused this instruction. In the jury instruction conference that occurred on the record, the trial court stated, "I think that it's covered in the instructions and [defendant's modified IPI Criminal No. 3.14] will not be given." Defendant argues on appeal that, after admitting evidence of the details his arrest but precluding the State's use of it to argue consciousness of guilt, the trial court erred by refusing to instruct the jury as to the permissible or impermissible purposes

for which the evidence was offered.

¶ 95       The function of jury instructions is to provide the jury with accurate legal principles to apply to the evidence so it can reach a correct conclusion. *People v. Hartfield*, 2022 IL 126729, ¶ 51. In a criminal case, the trial court is obligated to properly instruct the jury on the elements of the offense, the burden of proof, and the presumption of innocence. *People v. Lovejoy*, 235 Ill. 2d 97, 150 (2009). The court's task is to determine whether the jury instructions, considered as a whole, fully and fairly announce the law applicable to the respective theories of the State and defense. *People v. Hudson*, 222 Ill. 2d 392, 399 (2006). It is for the trial court to determine, after considering the facts and governing law, whether the jury should be instructed on a particular subject. *People v. Simms*, 192 Ill. 2d 348, 412 (2000). The decision about whether to give a particular jury instruction is a matter within the sound discretion of the trial court and will be reversed on review only if the trial court abused its discretion. *Lovejoy*, 235 Ill. 2d at 150.

¶ 96       As discussed above, we believe the trial court's ruling on this issue reflects its splitting of the difference between the parties' opposing positions, each of which had merit. The trial court would have acted within its discretion to admit this evidence as relevant to consciousness of guilt without limitation, but the defendant benefitted in part from the trial court's ruling that the State could not make that argument. We recognize that the jury did not have the benefit of instruction or argument of counsel as to how to make use of this evidence. However, in light of the trial court's handling of this issue, which we found was not an abuse of discretion, we conclude also that its decision to deny defendant's modified IPI Criminal No. 3.14 was not an abuse of discretion. Giving this instruction would only have highlighted the evidence of the details of the arrest, which as we noted was otherwise relegated to a minor point of the case. We also find the tendered instruction to be underinclusive in a way that renders it confusing. It instructs the jury that it cannot consider

specific evidence of his punching, kicking, and disobeying commands as evidence of guilt, while making no mention of whether or how it could consider the arguably more inflammatory evidence of defendant's statement that the police would have to shoot him. As tendered, it would have introduced confusion into the jury's deliberation along with drawing undue attention to this evidence. *People v. Herron*, 215 Ill. 2d 167, 187-88 (2005) (jury instructions should not be misleading or confusing). The refusal of this instruction was not an abuse of discretion.

¶ 97                            D. Instruction on D.Y.'s Age

¶ 98        Defendant's fourth argument on appeal is that the trial court abused its discretion in rejecting a nonpattern jury instruction tendered by the defense that stated:

> "You have received some evidence that [D.Y.] was 16 years old on September 22, 2018. Her age may only be considered by you for the limited purpose of considering the believability of [D.Y.]"

He relatedly argues that the trial court erred by omitting the optional paragraph 7 from IPI Criminal No. 1.01, stating, "Any evidence that was received for a limited purpose should not be considered by you for any other purpose." The trial court stated in denying defendant's tendered instructions that there was no allegation in the case concerning the age of the parties.

¶ 99        Defendant, who was age 29 at the time of this incident, argues that he faced a substantial risk in this case that jurors would have a lay understanding of "statutory rape" as meaning any sex between a minor and an adult, which would not coincide with the charges for which he was on trial. Defendant points out that he was not charged with any age-related offenses. Accordingly, he argues, clear instruction by the trial court about how the jury could consider D.Y.'s age in its deliberations was necessary to avoid the risk of prejudice against him or confusion of legal issues.

¶ 100       The decision whether to give a nonpattern jury instruction on a particular topic rests with the

sound discretion of the trial court. *People v. Jenkins*, 2021 IL App (1st) 200458, ¶ 94; *People v. Iniguez*, 361 Ill. App. 3d 807, 814 (2005). Nonpattern jury instructions must not be misleading or confusing. *People v. Burton*, 338 Ill. App. 3d 406, 413 (2003).

¶ 101 The State argues that defendant's tendered instruction was properly refused because it would have confused issues for the jury, by instructing it to limit its consideration of D.Y.'s age only to issues of her believability, when her age was relevant to issues beyond her credibility alone. The State argues that consideration of her age was also important to understanding some of the choices she made and behavior in which she engaged during the events at issue. It cites the trial court's recognition of this exact point earlier in the case, which it no doubt continued to recognize when it ruled on jury instructions. We agree that as tendered, defendant's nonpattern instruction concerning D.Y.'s age was misleading and inaccurate in stating that her age could be considered only for the purpose of considering her believability. Accordingly, the trial court did not abuse its discretion in refusing this instruction.

¶ 102 E. One-Act, One-Crime

¶ 103 Defendant's final argument on appeal is that his conviction for aggravated battery should be vacated under one-act, one-crime principles because both that conviction and his conviction for aggravated criminal sexual assault were based on the same act of strangling D.Y. He contends that, although various acts could constitute the use of "force or threat of force" required for aggravated criminal sexual assault (see 720 ILCS 5/11-1.20(a)(1), 11-1.30(a) (West 2018)), only the act of strangling D.Y. could satisfy the aggravating factor of acting "in a manner that threatens or endangers the life of the victim." *Id.* § 11-1.30(a)(3). He contends that other than strangulation, no act shown by the evidence rises to the level necessary to satisfy the aggravating factor. Accordingly, he argues, both convictions are based on the same act of strangulation, meaning that

the aggravated battery conviction must be vacated as the less serious offense. We reject defendant's argument.

¶ 104    The one-act, one-crime rule prohibits convictions for multiple offenses that are based on precisely the same physical act. *People v. Smith*, 2019 IL 123901, ¶ 13. Whether a violation of this rule has occurred is a question of law subject to *de novo* review. *Id.* ¶ 15. The determination of whether a violation has occurred involves a two-step analysis, in which we first determine whether a defendant's conduct consisted of a single physical act or separate acts. *People v. Coats*, 2018 IL 121926, ¶ 12. Multiple convictions are not proper if they are based on precisely the same physical act. *Smith*, 2019 IL 123901, ¶ 15. If it is determined that the defendant committed multiple acts, we proceed to determine whether any of the offenses are lesser-included offenses. *Coats*, 2018 IL 121926, ¶ 12. If none of the offenses are lesser-included offenses, then multiple convictions are proper. *Id.*

¶ 105    As to the first step, we find it clear that defendant's conduct consisted of multiple acts, even assuming that strangulation was an act common to both offenses. For purposes of this analysis, an "act" is "any overt or outward manifestation which will support a separate offense." *Smith*, 2019 IL 123901, ¶ 18. While the act of strangulation may have been common to both the offense of aggravated criminal sexual assault and aggravated battery, our supreme court has repeatedly recognized that "a person can be guilty of two offenses when a common act is (1) part of both offenses or (2) part of one offense and the only act of the other offense." *Id.* (citing *Coats*, 2018 IL 121926, ¶ 15; *People v. Rodriguez*, 169 Ill. 2d 183, 188 (1996)).

¶ 106    In *Smith*, the supreme court addressed a claim that convictions for robbery and aggravated battery of a senior citizen were based on a single act of punching the victim. The court reasoned that, while the punch supported the aggravated battery conviction and served as the force necessary

to effectuate the robbery, the use of force was only part of the wrongful conduct of the robbery offense. *Smith*, 2019 IL 123901, ¶ 22. The robbery offense required a taking of property, in addition to an act of force or threat of force. *Id.* (citing 720 ILCS 5/18-1(a) (West 2008)). As charged (and as shown by the evidence) defendants also took money from the victim after punching him. *Id.* ¶ 23. Thus, although the two acts were "interrelated," the defendants' taking of property "provides a separate act upon which to support the robbery offense," meaning the two offenses were not carved from precisely the same physical act. *Id.*

¶ 107    The same analysis is applicable here. While defendant's conduct of strangling D.Y. supported the aggravated battery conviction and constituted an act that threatened or endangered her life for purpose of the aggravated criminal sexual assault conviction, the strangulation was only one part of the offense of aggravated criminal sexual assault. That offense also required "an act of sexual penetration," in addition to the use of force and the act that threatens or endangers life. 720 ILCS 5/11-1.20(a)(1), 11-1.30(a)(3) (West 2018). Such an act of sexual penetration (*i.e.*, contact between defendant's penis and D.Y's mouth) was charged and shown by the evidence to have occurred. Thus, setting aside any other acts of force in addition to strangulation, defendant's act of sexual penetration upon D.Y. is itself a separate act that supports the offense of aggravated criminal sexual assault, meaning that the two offenses in this case were not carved from precisely the same act.

¶ 108    Having determined that defendant committed multiple acts, the second step of the analysis requires us to determine whether any of the offenses are lesser-included offenses. In making this determination in this context, we apply the "abstract elements" approach. *Smith*, 2019 IL 123901, ¶ 37 (citing *Coats*, 2018 IL 121926, ¶ 30). Under the abstract elements approach, we compare the statutory elements of the two offenses; if all the elements of one offense are included within a second offense, and the first offense contains no element not included in the second offense, then

the first offense is deemed a lesser included offense of the second. *People v. Miller*, 238 Ill. 2d 161, 166 (2010). "In other words, it must be impossible to commit the greater offense without necessarily committing the lesser offense." *Id.*

¶ 109     Defendant's argument is directed solely at the first step of this analysis, and he makes no argument that aggravated battery is a lesser included offense of aggravated criminal sexual assault. We likewise conclude that it is not a lesser included offense. Aggravated criminal sexual assault can be committed by threats of force and threatening acts alone or by acts of force not involving strangulation (see 720 ILCS 5/11-1.20(a)(1), 11-1.30(a)(3) (West 2018)), whereas aggravated battery requires causing bodily harm or physical contact by strangulation. *Id.* §§ 12-3, 12-3.05(a)(5). It is therefore possible to commit aggravated criminal sexual assault without necessarily committing aggravated battery. Accordingly, we reject defendant's one-act, one-crime challenge to his conviction for aggravated battery.

¶ 110                                F. Speedy Trial

¶ 111     In his opening brief, defendant argued that his speedy trial rights were violated by the trial court's granting of continuances in reliance on unconstitutional orders from the Illinois Supreme Court concerning trial-setting during the COVID-19 pandemic. In his reply brief, defendant acknowledges that he is no longer pursuing relief on this basis in light of the supreme court's decision in *People v. Mayfield*, 2023 IL 128092. Accordingly, we need not address this argument any further.

¶ 112                                III. CONCLUSION

¶ 113     For the reasons set forth above, we affirm the judgment of the circuit court.

¶ 114     Affirmed.